ESSEX BUILDERS GROUP,
INC., Plaintiff,

v.

AMERISURE INSURANCE COMPANY and OneBeacon Insurance
Company, Defendants.

No. 6:04CV1838ORL22JGG.

United States District Court,
M.D. Florida,
Orlando Division.

Sept. 21, 2005.

---

**1.** *Thomas v. Town of Davie,* 847 F.2d 771, 774–75 (11th Cir.1988).

Brenton Neil Ver Ploeg, Stephen A. Marino, Jr., Ver Ploeg & Lumpkin, P.A., Miami, FL, Robert Patrick Major, Winderweedle, Haines, Ward & Woodman, P.A., Orlando, FL, for Plaintiff.

E.A. "Seth" Mills, Jr., Brett D. Divers, Mills Paskert Divers, P.A., Tampa, FL, for Intervenor-Plaintiff, Travelers Casualty and Surety Co.

John Bond Atkinson, Rebecca Ann Brownell, Atkinson & Brownell, P.A., Miami, FL, Jeffrey Russell Davis, Stuart J. Freeman, Brasfield, Fuller, Freeman, & O'Hern, P.A., St. Petersburg, FL, for Defendants.

## ORDER

CONWAY, District Judge.

### I. INTRODUCTION

This cause comes before the Court for consideration of the following motions filed

in this insurance coverage dispute: Defendant OneBeacon Insurance Company's Motion for Partial Summary Judgment (Doc. 37); Defendant OneBeacon Insurance Company's Motion to Dismiss Count II of Amerisure's Third–Party Claims and Cross–Claim and Demand for Attorneys' Fees Under Florida Statute § 627.428 (Doc. 72); Plaintiff Essex Builders Group, Inc.'s Notice of Partial Joinder in OneBeacon's Motion to Dismiss, etc. (Doc. 88); Defendant Amerisure Insurance Company's Motion to Stay/Abate Plaintiff's Claim for "Bad Faith" Damages Pending Resolution of Insurance Coverage Dispute (Doc. 84); and Third–Party Defendant National Union Fire Insurance Company of Pittsburgh, PA's Motion to Dismiss Count II of the Third–Party Complaint (Doc. 97). After carefully considering these motions and associated filings, the Court issues the rulings set forth herein.

## II. BACKGROUND AND PROCEDURAL HISTORY

In March 1999, Plaintiff Essex Builders Group, Inc. ("Essex") entered into an agreement to act as general contractor on an apartment construction project. Intervenor–Plaintiff Travelers Casualty & Surety Company's predecessor, Reliance Insurance Company, issued a performance bond on behalf of Essex. Following project completion, the owner experienced water damage to the apartment buildings. After incurring substantial costs in remedying the problem, the owner demanded reimbursement from Essex. The owner also made a claim against the bond. Essex's commercial general liability ("CGL") insurers, Defendants OneBeacon Insurance Company ("OneBeacon") and Amerisure Insurance Company ("Amerisure"), received notice of the claim against Essex,

but did not pay it. Ultimately, Travelers paid the project owner $6.25 million to resolve the owner's claim.

In the present lawsuit, Essex sues OneBeacon and Amerisure for breach of the CGL insurance contracts. Essex seeks the amount due under the policies, damages incurred by Essex in defending against the owner's claim, consequential damages, pre- and post-judgment interest, and attorneys' fees and costs pursuant to Fla. Stat. § 627.428. Travelers has intervened as a plaintiff, based on its subrogation rights obtained through Essex. Travelers seeks the first $6.25 million allegedly due under OneBeacon's and Amerisure's CGL policies, along with attorneys' fees and other expenses.

In turn, Amerisure has filed third-party claims against Liberty Mutual Fire Insurance Company ("Liberty Mutual"); National Union Fire Insurance Company of Pittsburgh, PA ("National Union"); Maryland Casualty Company ("Maryland Casualty"); Great American Insurance Company ("Great American"); Assurance Company of America ("Assurance"); National Trust Insurance Company ("National Trust"); and St. Paul Fire & Marine Insurance Company ("St.Paul"); as well as a cross-claim against OneBeacon.[1] Amerisure asserts that Essex was an additional insured under primary and/or umbrella liability policies these other insurers issued to subcontractors on the apartment construction project. Apart from these subcontractor policies, Amerisure asserts that OneBeacon issued a policy directly to Essex, and that Essex was also covered by a policy issued by Great American. Amerisure maintains that if its CGL policy issued to Essex is found to cover the claims of the project owner and Travelers, then these other insurance

---

**1.** Amerisure's cross-claim identifies OneBeacon as "One Beacon Insurance Company, f/k/a General Accident Insurance Company of America." Doc. 61, ¶ 2, at 2.

policies also afford coverage for such claims. Accordingly, Amerisure seeks a declaratory judgment concerning whether, and to what extent, all of these policies cover the claims asserted by the project owner and Travelers, which of these policies are responsible for defense costs, and the manner in which the various policies interact with each other. Additionally, Amerisure asserts a claim for equitable contribution and equitable and contractual subrogation against these other insurers.

## III. ONEBEACON'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Procedural Background

In its initial summary judgment filing, OneBeacon argued that it had no obligation to indemnify Essex in connection with a state lawsuit filed by Travelers. However, this Court noted that "Essex seeks damages resulting from OneBeacon's failure to respond to and make payment on the apartment owner's claim, not indemnification from liability in the pending [state] action brought by Travelers." Doc. 82 at 2. Accordingly, the Court deemed Essex's initial argument to be meritless. *Id.* at 3. The Court adheres to that ruling here. OneBeacon's initial summary judgment argument simply does not confront the allegations of Essex's complaint. Accordingly, on this point, One-Beacon has failed to demonstrate its entitlement to judgment as a matter of law.

The inquiry does not end here, though. After Travelers and Essex filed responses to OneBeacon's summary judgment motion, OneBeacon was granted permission to file a reply brief. In its reply, OneBeacon "introduced for the first time the argument that the 'legally obligated to pay' clause in the insurance policy negates coverage for a breach of contract claim, which is how OneBeacon characterizes the project owner's original claim." Doc. 82 at 3.

The Court determined that this argument warranted further analysis, and therefore required Essex and Travelers to file sur-replies. *Id.* Travelers has complied; Essex has not.

### B. The Policy Language

The "Insuring Agreement" section of the CGL policy OneBeacon issued Essex provides: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Commercial General Liability Coverage Form (attached as Ex. "A" to Doc. 1), § I.A.1.a. The policy further states: "This insurance applies to 'bodily injury' and 'property damage' only if ... [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory', and ... [t]he 'bodily injury' or 'property damage' occurs during the policy period." *Id.,* § I.A.1.b(1) & (2). The "definitions" section of the policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.,* § V.12. However, the policy does not define the word "accident."

### C. The Parties' Positions

At the outset, the Court observes that OneBeacon's motion is "partial" in the sense that it seeks summary judgment only regarding the duty to indemnify, not the separate duty to defend.

Distilled to its essence, OneBeacon's summary judgment argument is that the policy's "legally obligated to pay" language refers only to tort liability, rather than contract-based liability. OneBeacon contends that since the underlying claims of the apartment project owner against Essex essentially represent an attempt to recover economic loss stemming from a breach of a construction contract, OneBeacon's CGL policy does not afford coverage

for such claims. OneBeacon contends that while Florida courts have not directly addressed the issue of whether a contractual claim by a construction project owner against a contractor is covered under the contractor's CGL policy, "this argument has been soundly rejected by other courts across the country." Doc. 59 at 3. Additionally, OneBeacon asserts that "Florida courts have universally recognized that general liability policies do not cover contractual liabilities of its [sic] insured." *Id.*

In response, Travelers maintains that the pertinent issue "is not whether Essex's claims sound in tort; it is whether there was an 'occurrence' under the Policy." Doc. 114 at 6. Travelers contends that recent decisions of the Florida Supreme Court and a Florida intermediate appellate court confirm that the events which gave rise to the project owner's claim against Essex constitute an "occurrence," resulting in coverage under the policy. Travelers further asserts that OneBeacon's interpretation of the "legally obligated to pay" clause would render other policy provisions meaningless, in contravention of Florida law.

### D. Analysis

OneBeacon cites non-Florida authority for the proposition that "[c]ourts across the country universally have interpreted the 'legally obligated to pay' coverage provision, identical to the phrase at issue here, as referring to liability sounding in tort, not in contract." Doc. 59 at 3 (footnote omitted) (citing, *e.g., Data Specialties, Inc. v. Transcontinental Ins. Co.,* 125 F.3d 909, 911 (5th Cir.1997)). However, in this diversity jurisdiction case, this Court's task is to ascertain and apply Florida law. Mindful of that premise, OneBeacon also relies on the Florida Supreme Court decision of *LaMarche v. Shelby Mut. Ins. Co.,* 390 So.2d 325 (Fla.1980).

In *LaMarche,* homeowners made a claim against their general contractor's insurer,

seeking damages for alleged defective materials and workmanship. The Florida Supreme Court did not directly confront the meaning of "legally obligated to pay" as that phrase is used in a CGL policy. Rather, the question presented was whether "the coverage provided to general contractors by a comprehensive liability policy ... includes payment for the cost of replacing defective materials and workmanship." 390 So.2d at 326. The Supreme Court paraphrased the "coverage" portion of the insurance policy at issue as "stating that Shelby [the insurer] would pay for bodily injury or property damage for which the contractor became liable." *Id.* The Court then quoted "the following three exclusionary provisions:"

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warrant of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

(n) to property damage to the named insured's products arising out of such products or any part of such products;

(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith[.]

*Id.*

The Florida Supreme Court rejected the homeowners' argument that exclusion (a) "grant[ed] coverage for damages arising from a breach of warranty of fitness or a failure to perform work in a workmanlike manner." *Id.* It also rejected the proposition that the homeowner should be granted coverage because the policy was ambiguous. *Id.* The Supreme Court affirmed the Second District Court of Appeal's non-coverage decision, stating:

Its decision is consistent with the majority of other jurisdictions which have considered this issue. The majority view holds that the purpose of this comprehensive liability insurance coverage is to provide protection for personal injury or for property damage caused by the completed product, but not for the replacement and repair of that product.

To interpret the policy as providing coverage for construction deficiencies, as asserted by the petitioners and a minority of states, would enable a contractor to receive initial payment for the work from the homeowner, then receive subsequent payment from his insurance company to repair and correct deficiencies in his own work. We find this interpretation was not the intent of the contractor and the insurance company when they entered into the subject contract of insurance, and the language of the policy clearly excludes this type of coverage. Rather than coverage and payment for building flaws or deficiencies, the policy instead covers damage caused by those flaws. We agree with the explanation of this type of coverage as stated by the Supreme Court of New Jersey in *Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 405 A.2d 788 (1979), in which it said:

> An illustration of this fundamental point may serve to mark the boundaries between "business risks" and occurrences giving rise to insurable liability. When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing

automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case.

405 A.2d at 791–92. The court in *Weedo* wrote an exhaustive opinion on this issue, discussing the majority and minority views. We fully agree with its logic and reasoning.

390 So.2d at 326–27.

As previously stated, *LaMarche* did not confront the meaning of a CGL policy's "legally obligated to pay" provision. Nevertheless, in the absence of any other relevant Florida authority, the pronouncements in *LaMarche* concerning the purpose of CGL coverage—"to provide protection for personal injury or for property damage caused by the completed product, but not for the replacement and repair of that product," 390 So.2d at 326—would suggest that OneBeacon is correct in its assertion that the present policy does not afford coverage for the cost of replacing Essex's allegedly defective work (as distinguished from damage caused by defective work). However, *LaMarche* cannot be read in isolation; it is not the only Florida case relevant to the policy interpretation issue at hand.

Travelers points out that subsequent to *LaMarche*, the Florida Supreme Court decided the case of *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072 (Fla.1998). Travelers characterizes *CTC Development* as "broaden[ing] CGL coverage by expanding the interpretation of what constitutes an 'accident' when that term is not defined in the policy." Doc. 114 at 8. That characterization is accurate.

The dispute in *CTC Development* arose from the construction of a residence which violated setback requirements contained in restrictive covenants. The architect/contractor[2] claimed that "he was under the

---

**2.** "Gregory Uzdevenes [was] a professional

architect and sole owner of the construction

mistaken impression that the homeowners' association had approved his request for a variance from the setback requirements." 720 So.2d at 1073. "It was only after the construction was sixty percent complete that [the architect/contractor] learned of a possible problem with the variance." *Id.* Neighboring property owners sued the architect/contractor and others, whereupon the architect/contractor requested that State Farm, which had issued a "contractor's policy" covering the architect/contractor, provide a defense and indemnity. State Farm declined. After settling with the neighbors, the architect/contractor sued State Farm, seeking damages stemming from the insurer's denial of coverage and failure to defend.

State Farm moved for summary judgment, relying on the prior Florida Supreme Court decision of *Hardware Mut. Cas. Co. v. Gerrits,* 65 So.2d 69 (Fla.1953). In *Gerrits,* a contractor who constructed a home on his own property "knowingly built the home at the location but did not intend to encroach on the neighboring property, relying on a faulty survey." *CTC Development,* 720 So.2d at 1074. The contractor's insurance policy "provided for reimbursement of all sums the insured became obligated to pay by virtue of an 'accident;'" however, "[t]he policy did not define the term 'accident.'" *Id.* The Supreme Court decided that "the insured's construction of the home over the property line could not be considered an accident because the insured 'deliberately and designedly (though erroneously) located the building on a part of the adjoining property and he intended to build it at that particular site.'" *Id.* (quoting *Gerrits,* 65 So.2d at 71). In reaching this conclusion, the *Gerrits* opinion stated: "'An effect which is the natu-

ral and probable consequence of an act or course of action is not an accident.'" *Id.* (emphasis omitted) (quoting *Gerrits,* 65 So.2d at 70).

■ Citing *Gerrits,* the insurer in *CTC Development,* State Farm, argued that, "as a matter of law, the construction of the home beyond the setback, even if built based on the mistaken assumption that a variance had been granted, did not constitute an 'occurrence' within the meaning of the policy." 720 So.2d at 1073–74. The trial court granted State Farm a summary judgment, whereupon Florida's First District Court of Appeal reversed that ruling. The Supreme Court affirmed the intermediate appellate court and receded from *Gerrits,* holding that "when the term 'accident' is undefined in a liability policy, the term includes not only 'accidental events,' but also damages or injuries that are neither expected nor intended from the viewpoint of the insured." *Id.* at 1072.

The Supreme Court began its analysis by quoting portions of the contractor's policy. The policy provided coverage for "those sums *that the insured becomes legally obligated to pay* as damages because of bodily injury, *property damage,* personal injury or advertising injury to which this insurance applies[.]" *Id.* at 1073 (emphasis in opinion). The policy further provided: "This insurance applies only: 1. to bodily injury or property damage *caused by an occurrence* which takes place in the coverage territory during the policy period." *Id.* (emphasis in opinion). The policy "broadly defined" "occurrence" as, in relevant part, "[a]n *accident,* including continuous or repeated exposure to substantially the same general harmful conditions which result in bodily injury or property dam-

company CTC Development Corporation, Inc. (CTC)." *CTC Development,* 720 So.2d at 1072. Both were insureds under the insurance policy involved in the case. *Id.* For

simplicity's sake, the architect and the construction company will be referred to herein collectively as "the architect/contractor."

age[.]" *Id.* (emphasis in opinion). A policy exclusion stated that coverage did not apply to: "bodily injury or property damage ... expected or intended *from the standpoint of the insured* [.]" *Id.* (emphasis in opinion).

The Supreme Court noted: "The ... policy ... defines occurrence as an 'accident,' but then leaves the term 'accident' undefined. However, an exclusionary clause in the same policy provides that coverage does not apply to property damage 'expected or intended from the standpoint of the insured.'" *Id.* at 1074.[3] The Court then recognized that "exclusionary clauses cannot be relied upon to create coverage," but stated that insurance policy provisions should be read *in pari materia* when assessing coverage. *Id.* at 1074–75. The Court then observed:

> Reading the coverage provision of the policy together with the exclusionary clause could support a conclusion that coverage is provided in the State Farm policy for occurrences where the insured did not intend or expect to cause harm to the third party.
>
> The existence of the exclusionary clause of the policy in this case could be considered a distinction from the policy in *Gerrits.* However, the *Gerrits* definition of "accident" could be broadly applied to any liability policy where the term is undefined; therefore, we are required to directly confront the scope of the term "accident," rather than rely solely on the exclusionary clause in this policy to distinguish this case from *Gerrits.*

720 So.2d at 1075 (citation and footnote omitted).

Next, the Supreme Court recounted the difficulty courts had experienced "in precisely defining the scope of coverage in liability policies providing coverage for 'accidents[.]'" *Id.* The Court noted that the

"restrictive definition of accident as 'an event happening suddenly proved to be unsatisfactory[.]'" *Id.* (citation omitted). Consequently, in 1966 and 1972, standard CGL policies were changed "by substituting the word 'occurrence' for 'accident,' and by defining 'occurrence' to mean 'an accident, including continuous or repeated exposure to conditions, which result[s] in bodily injury or property damage neither expected nor intended from the standpoint of the insured.'" *Id.* (alteration in original) (citation omitted). "[U]nder this definition," the Court stated, "[c]overage ... would be provided not only for an accidental event, but also for the unexpected injury or damage resulting from the insured's intentional acts." *Id.* In other words, "if the resulting damages are unintended, the resulting damage is 'accidental even though the original acts were intentional.'" *Id.* (citation omitted).

The Supreme Court then noted that the insurance policy in *CTC Development,* like the one in *Gerrits,* did not define the word "accident." *Id.* at 1076. The Court stated the absence of such a definition did not necessarily render the term "accident" ambiguous. *Id.* "However," the Court remarked, "where policy language is subject to differing interpretations, the term should be construed liberally in favor of the insured and strictly against the insurer." *Id.* Moreover, the Court stated, "when an insurer fails to define a term in a policy, ... the insurer cannot take the position that there should be a narrow, restrictive interpretation of the coverage provided." *Id.* (internal quotation marks and citation omitted). Continuing, the Supreme Court stated:

> In this case, we conclude that the term "accident" within a liability policy is susceptible to varying interpretations and should be construed in favor of the in-

---

**3.** The same exclusion appears in OneBeacon's CGL policy. *See* Ex. "A" to Doc. 1, § I.A.2.a.

sured. Rather than defining the term most favorably to the insured, this Court in its 1953 *Gerrits* opinion adopted a more restrictive definition—a definition that was improperly derived from tort law. Moreover, the definition of "accident" set forth by this Court in *Gerrits* is contrary to the standardized language found in comprehensive general liability policies since 1972. We therefore recede from *Gerrits* and its outmoded definition of "accident" in liability policies. We hold that where the term "accident" in a liability policy is not defined, the term, being susceptible to varying interpretations, encompasses not only "accidental events," but also injuries or damage neither expected nor intended from the standpoint of the insured. This definition comports with the language used in standard comprehensive general liability policies and with the definition of the term "accidental" . . . as "unexpected or unintended."

720 So.2d at 1076 (citations omitted).

Applying this reasoning to the case at hand, the Supreme Court concluded:

Viewing the facts most favorably to the insured, [the architect/contractor] did not expect or intend for damages to result from his act of constructing the home. He did not openly defy the setback requirements; he mistakenly believed that he had received a variance for the construction. Therefore, the fact that he intentionally constructed the house knowing that it was outside of the setback line does not preclude a finding of coverage under his liability policy for this "occurrence." We conclude that summary judgment was improperly granted because the trial court applied the *Gerrits* definition of accident and concluded, as a matter of law, that the damage suffered by the [neighbors] was not covered by the liability policy. Accordingly, we approve the result reached

by the First District and recede from *Gerrits*.

720 So.2d at 1076–77 (alterations added) (footnote omitted).

At first blush, *CTC Development* would not seem to impact *LaMarche* sufficiently to compel a different result from *LaMarche* in the present case. However, building on the rationale of *CTC Development*, OneBeacon further relies on the recent opinion of *J.S.U.B., Inc. v. U.S. Fire Ins. Co.*, 906 So.2d 303 (Fla. 2d DCA 2005).

The insured in *J.S.U.B.* was a general contractor involved in residential construction. The builder's sub-contractors "performed all work related to soil acquisition, compaction, and testing" concerning the construction of the homes at issue. *J.S.U.B.*, 906 So.2d at 304. "After completion of construction, some homes suffered damage when the exterior walls moved or sank as a result of improper compaction of the soil, improper testing of the soil compaction, poor soil or fill material, or a combination thereof." *Id.* at 304–05. This damage included structural damage. The general contractor demanded coverage under its CGL policy, but the insurer denied coverage. The builder then brought a declaratory judgment action against its insurer. The insurer "maintained that the policies did not cover damage to the Builder's own work or product that resulted from the Builder's or a subcontractor's faulty workmanship." *Id.* at 305. The trial court "determined that the damage was the result of faulty workmanship caused by the subcontractors' use of poor soil, improper soil compaction, or improper testing and that the policies did not provide coverage for faulty workmanship." *Id.* Accordingly, judgment was entered in the insurer's favor. The builder appealed.

Florida's Second District Court of Appeal began its discussion by quoting the CGL policy's coverage provisions, defini-

tions, exclusions and exceptions to exclusions. Notably, the policy language quoted in *J.S.U.B.* is identical to the provisions in the instant case. In other words, like OneBeacon's policy, the policy in *J.S.U.B.* contained a provision affording coverage for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage;'" it limited coverage to bodily injury and property damage resulting from an "occurrence;" it defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions;" and it did not contain a definition of "accident." *Id.* at 305–08. Additionally, the policy in *J.S.U.B.* contained exclusions identical to those present in the instant policy. *Id.* at 305–06.

The Second DCA then reiterated settled insurance contract interpretation principles. More specifically, the appellate court stated: "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the policy is ambiguous." *Id.* at 307. The Court also stated:

> Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy. Likewise, ambiguous insurance policy exclusions are construed against the drafter and in favor of the insured. In fact, exclusionary clauses are construed even more strictly against the insurer than coverage clauses.

906 So.2d at 307 (quoting *Auto–Owners Ins. Co. v. Anderson,* 756 So.2d 29, 34 (Fla.2000)). Additionally, the *J.S.U.B.* court stated: "'in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect.'" *Id.* (quoting *Auto–Owners,* 756 So.2d at 34).

Next, the Second DCA noted that the trial court had relied on *LaMarche* in determining that the CGL policies did not afford coverage. On that point, the appellate court observed: "In the past, Florida courts have generally taken the position that CGL policies do not cover the cost of replacement of a builder's or general contractor's defective materials or workmanship[,]" and that this general rule had been extended to "defective work performed by a subcontractor on a general contractor's behalf." 906 So.2d at 307. The Court then summarized the builder's position on appeal:

> [T]he Builder challenges the trial court's determination that the policies do not cover the losses, arguing that (1) in 1986, several years after *LaMarche* was decided, portions of the standard language in CGL policies changed; and (2) in *State Farm Fire & Casualty Co. v. CTC Development Corp.,* 720 So.2d 1072 (Fla.1998), the Florida Supreme Court effectively broadened CGL coverage by expanding the interpretation of what constitutes an "accident" when that term is not defined in an occurrence-based policy. The Builder argues that the Insurer's policies provide broader coverage than the policy that was at issue in *LaMarche* and, therefore, that the trial court erred in concluding that no coverage existed.

906 So.2d at 307.

The Second DCA agreed with this argument. *Id.* It characterized *LaMarche* as focusing on policy exclusionary language, rather than coverage language. *Id.* at 307–08. The appellate court then remarked:

> The CGL policies at issue here are standardized policies promulgated by the Insurance Services Office, an insurance industry service organization. The language contained in the "Insuring Agreement" portion of the policies is

similar, though not identical, to the policy language involved in *LaMarche. See* 371 So.2d at 198–99. However, the policies contain significantly different exclusions than those that were addressed in *LaMarche.* Prior to 1986 it was common for CGL policies to exclude coverage for damages occurring after the insured completed its work, but "[i]t is now common for such policies to include 'products/completed operations hazard' coverage." 9 Couch on Insurance § 129:14 (Lee R. Russ & Thomas F. Segalla eds., 3d ed.2004), WL COUCH § 129:14. A completed operations exclusion bars coverage for injuries that occur after the insured completed its work on a particular operation. *Id.*

The policies here contain broad insuring language covering property damage that is caused by an "occurrence" in the coverage territory that takes place during the policy period. The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident" is not defined in the policy. However, in *CTC Development,* the supreme court considered "whether the term 'accident' in a liability policy, which term is not otherwise defined, should be defined to include not only 'accidental events,' but also injuries or damages that are neither expected nor intended from the standpoint of the insured." 720 So.2d at 1074. In holding that it does, the court receded from an earlier, more restrictive definition of "accident" that the court had adopted in *Hardware Mutual Casualty Co. v. Gerrits,* 65 So.2d 69 (Fla.1953). *See CTC Development,* 720 So.2d at 1076.

906 So.2d at 308.

The *J.S.U.B.* court discussed *CTC Development* in greater detail, then characterized the Florida Supreme Court's holding as follows:

The court concluded that where the term "accident" is not defined in a liability policy, it "encompasses not only 'accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured." [720 So.2d] at 1076. On that basis, the court held that a contractor's construction of a home in violation of setback requirements—under the mistaken belief that it had obtained a variance for the construction—was an occurrence covered under the policy. *Id.*

906 So.2d at 308–09.

Applying *CTC Development,* the Second DCA stated:

The pertinent insuring provisions in the policies here are similar to those in *CTC Development,* and the insurance covers "property damage" only if such damage is "caused by an 'occurrence' that takes place in the 'coverage territory'" during the policy period. As with the *CTC Development* policy, the policies here define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," but the term "accident" is undefined. The Insurer argues that workmanship deficiencies that resulted in later damage to the homes should not be considered to be the result of an accident. However, the Insurer's broad policy language that defines an "occurrence" but does not define an "accident," and the broad definition of "accident" adopted in *CTC Development,* lead to the conclusion that the occurrences here fall within the coverage provisions of the policies.

Based on the foregoing analysis, we cannot agree with the Insurer's contention that *LaMarche* and its progeny compel the conclusion that the polic[i]es do not provide coverage for the Builder's claims. Other courts and commentators

have also come to the conclusion that CGL policies provide coverage in circumstances such as those present here.

906 So.2d at 309 (footnotes omitted).

The *J.S.U.B.* court proceeded further, stating:

In considering the scope of the insurance coverage, we must also consider the exclusions contained in the policies. In *CTC Development* the supreme court reiterated that "exclusionary clauses cannot be relied upon to create coverage." 720 So.2d at 1074. However, it also noted that the principles governing the construction of insurance contracts require that policy provisions be read *in pari materia,* and that "[r]eading the coverage provision of the policy together with the exclusionary clause could support a conclusion that coverage is provided in the ... policy for occurrences where the insured did not intend or expect to cause harm to the third party." *Id.* at 1075. Thus, we must consider the pertinent exclusions contained in the policies and their impact on the Builder's claims.

906 So.2d at 309–10.

The appellate court then addressed three policy exclusions, entitled "Damage to Property," "Damage To Your Work," and "Damage To Impaired Property Or Property Not Physically Injured." As previously noted, these exclusions are identical to exclusions present in the One-Beacon policy at issue in this case. The exclusions provide as follows:

This insurance does not apply to:

j. Damage To Property
 "Property damage" to:
 * * * * * *

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

* * * * * *

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

* * * * * *

1. Damage To Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. Damage To Impaired Property Or Property Not Physically Injured
"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

906 So.2d at 305–06.

Addressing these exclusions, the Second DCA distinguished *LaMarche* on the basis that "[t]he exclusions addressed in *LaMarche* are significantly different than those involved here." 906 So.2d at 310. The appellate court concurred in the builder's argument that the policy must be read as a whole and that "the exceptions to the exclusions would have no meaning if the

policies are interpreted as providing no coverage for the claims." *Id.* On that point, the Court stated: "This argument is consistent with the dictates of *CTC Development* that reading a policy's coverage provisions together with its exclusions may provide support for a conclusion that the policy provides coverage for a given occurrence." *Id.*

Regarding the "Damage to Property" exclusion, the Second DCA stated:

Although the Insurer concedes that the exclusion for "Damage to Property" does not apply, the terms of that exclusion are relevant to our review of the policy as a whole. Subparagraph 5 of the exclusion reflects that it does not apply because the work had been completed on the property. Subparagraph 6 excludes coverage for restoration, repair, or replacement that is required because of work that was incorrectly performed. However, an exception to the exclusion is for "property damage" included in the "products-completed operations hazard." If we were to read the policies as suggested by the Insurer, without considering the import of the exclusions, it is arguable that this exclusion and exception to the exclusion would have no meaning or effect in this policy, particularly when considering the nature of the occurrences leading to the Builder's claims. Again, while the exclusion does not create coverage, it is consistent with and provides support for our analysis that the insuring provisions of the policies provide coverage to the Builder's claims.

*Id.*

Concerning the "Damage To Your Work" exclusion, the appellate court stated:

Similarly, the "Damage To Your Work" exclusion contains an exception for work performed by a subcontractor on the Builder's behalf. The Insurer does not contend that the exclusion applies; instead, it simply reiterates its view that the policy simply provides no coverage for the Builder's claims. If the policies provide coverage, the exception to this exclusion would apply because the damage that occurred was the result of the subcontractors' use of poor soil and improper soil compaction and testing. Accordingly, based on our conclusion that the policies provide coverage, this exclusion does not apply because the exception to the exclusion applies.

*Id.*

Addressing the third exclusion, the Second DCA stated:

The Insurer next contends that even if coverage could exist under the policies, then the exclusion for "Damage To Impaired Property Or Property Not Physically Injured" eliminates coverage for the Builder's claims. The Insurer suggests that application of the exclusion depends on whether the completed structure is viewed as the work or product of the Builder. Also, the Insurer argues that the subject damage is excluded from coverage as damage to "impaired property" because the Builder provided defective houses and failed to fulfill its contract and because the houses could be restored to use by the Builder making the necessary repairs or fulfilling the terms of the contract.

We cannot agree with the Insurer's interpretation of this exclusion. The record establishes that the property involved here qualifies as physically injured, so the portion of the exclusion that addresses property that has not been physically injured does not apply. The property also does not qualify as "impaired property" because that term is defined as "tangible property, *other than 'your product' or 'your work'.*" (Emphasis added.) Because the homes are undeniably the Builder's work or

product, as the terms "your work" and "your product" are defined and used in the policies, this exclusion does not apply.

*Id.* at 310–11.

Based on this analysis, the Second DCA reversed the trial court's decision in the insurer's favor, and held that "the CGL policies at issue here provide coverage to the Builder and that the exclusions contained in the policies do not apply." *Id.* at 311.

This Court believes *J.S.U.B.* represents a correct interpretation of *LaMarche* and *CTC Development.* As the Second DCA indicated in *J.S.U.B., CTC Development* broadened the manner in which "coverage" provisions in CGL policies must be interpreted. To that extent, *LaMarche* has been limited. Moreover, *J.S.U.B.* illustrates the proper mode of analysis when a court is confronted with a coverage interpretation question such as presented in the instant case.

■ Applying these principles to the case at bar, the Court rejects OneBeacon's narrow interpretation of the policy's "legally obligated to pay" clause. Consistent with *CTC Development* and *J.S.U.B.,* the proper inquiry is not whether the claims against OneBeacon sound in tort or in contract, but whether there has been an "occurrence" under the policy. This proposition is amply illustrated by *J.S.U.B.,* considering the claims in that case were apparently contract-based. In light of *CTC Development*'s and *J.S.U.B.*'s expansive interpretations of "occurrence" and "accident," and given *Auto–Owners'* pronouncements concerning insurance policy language construction, OneBeacon has simply failed to demonstrate that the "insuring agreement" portion of the present policy does not afford coverage for the events underpinning this lawsuit. In other words, OneBeacon has not shown as a matter of law that an "occurrence" did not

take place, given the fact that the property damage to the project was at least arguably accidental in the sense that it was not expected or intended from the insured's viewpoint. Hence, whether an "occurrence" actually occurred remains an issue of fact to be resolved at some point in the future. Moreover, examination of the policy exclusions identified by Travelers, which must be construed *in pari materia* with the remainder of the policy, reveals that certain of the exclusions would be rendered superfluous if the policy were interpreted in the manner suggested by OneBeacon. In particular, the Court agrees with Travelers that the "Contractual Liability" and "Damage to Property" exclusions would be meaningless if the policy did not otherwise contemplate liability in some contract-based scenarios. Based on this reasoning, the Court determines that OneBeacon's summary judgment motion must be denied.

Before leaving this motion, however, the Court is compelled to add that OneBeacon does not seek summary judgment on the basis of any of the policy's exclusions. *See* Doc. 37 at 5 n.2 ("Issues related to the priority of coverage and/or relevant policy exclusions are topics reserved for consideration at a later time"). Consequently, the Court has addressed exclusions only insofar as they are relevant in construing the policy as a whole for the purpose of determining whether the policy may generally afford coverage. Further analysis and application of the exclusions must await another day.

## IV. DEFENDANT ONEBEACON'S MOTION TO DISMISS COUNT II OF AMERISURE'S THIRD–PARTY CLAIMS AND CROSS–CLAIM AND DEMAND FOR ATTORNEYS' FEES UNDER FLORIDA STATUTE § 627.428

■ By means of this motion, OneBeacon seeks dismissal of Amerisure's cross-

claims for subrogation and contribution, along with Amerisure's demand for attorneys' fees pursuant to Fla. Stat. § 627.428. OneBeacon contends that Amerisure has failed to state a claim for subrogation because it has not alleged that it paid any money on its insured's (Essex's) behalf. OneBeacon asserts that Amerisure cannot pursue a contribution claim under a joint tort-feasor contribution theory because Amerisure's alleged underlying liability is contractual, rather than tort-based. OneBeacon argues that Amerisure cannot maintain a contribution claim under a co-obligor theory because, again, Amerisure has not paid out any money. Finally, OneBeacon maintains that the text of Fla. Stat. § 627.428 makes clear that only named insureds, omnibus insureds and named beneficiaries may recover attorneys' fees under the statute, and that Amerisure plainly does not qualify as such.

In its response, Amerisure summarizes its position with respect to its cross-claim and third-party claims:

> The position of AMERISURE in these claims is that multiple other carriers also afford coverage for ESSEX BUILDERS GROUP, INC., and that those policies provided primary coverage to ESSEX, while AMERISURE only provides excess coverage. Under theories of equitable subrogation/equitable contribution, AMERISURE seeks recovery against these multiple insurance carriers (all of whom directly insured various subcontractors on the project and whose policies include ESSEX BUILDERS as an additional insured).
>
> ONEBEACON is a Cross–Defendant in two capacities in this case. ONEBEACON issued a policy of insurance directly to Essex. Additionally, ONEBEACON issued a policy of insurance to one of the subcontractors on the project un-

der which ESSEX qualifies as an additional insured.

Doc. 91 at 2–3.

Amerisure characterizes OneBeacon's dismissal arguments as "legally invalid" because: "1) AMERISURE has asserted legally valid claims for equitable subrogation and equitable contribution which are recognized under Florida law; and 2) it is not required under Florida or federal law that AMERISURE have made a payment in order to assert these claims." *Id.* at 3. Additionally, on the subject of Fla. Stat. § 627.428, Amerisure asserts that "Florida courts have held multiple times that if an excess carrier is successful in a claim against a primary carrier, ... the excess carrier has the right to recover attorney's fees" under the statute. *Id.* at 10.

 OneBeacon's challenges to the equitable subrogation and contribution claims lack merit. Florida law recognizes an excess insurer's right to pursue an equitable subrogation claim against a primary insurer. *See Galen Health Care, Inc. v. American Cas. Co. of Reading, PA.,* 913 F.Supp. 1525, 1531 (M.D.Fla.1996) ("Florida law recognizes a cause of action for equitable subrogation between primary and excess insurers arising from the payment of a claim by the excess insurer"); *U.S. Fire Ins. Co. v. Morrison Assur. Co.,* 600 So.2d 1147, 1151 (Fla.App. 1st DCA 1992) (citing *Ranger Ins. Co. v. Travelers Indem. Co.,* 389 So.2d 272 (Fla. 1st DCA 1980), for the proposition that "by operation of law, an excess carrier has the right, even in the absence of a contract or assignment from its insured, to maintain a cause of action under the equitable doctrine of subrogation for damages resulting from the primary carrier's bad faith refusal to settle the claim against their common insured"). Similarly, Florida law permits an excess carrier to sue a primary carrier for equitable contribution. *See Employ-*

ers' Fire Ins. Co. v. Continental Ins. Co., 326 So.2d 177, 180 (Fla.1976) (implicitly recognizing excess insurer's right to assert contribution claim against primary insurer).[4] Moreover, Florida decisions hold that contingent claims of equitable subrogation and contribution can be asserted prior to making payment. See Gortz v. Lytal, Reiter, Clark, Sharpe, Roca, Fountain & Williams, 769 So.2d 484, 485–88 (Fla. 4th DCA 2000) (involving claims of equitable subrogation and contribution); Attorneys' Title Ins. Fund, Inc. v. Punta Gorda Isles, Inc., 547 So.2d 1250, 1251 (Fla. 2d DCA1989) (rejecting argument that insurer's subrogation claim was premature because insurer had not yet made payment to insured, and also recognizing that "a claim for contribution can be brought as a cross-claim or a third party claim, on a contingent basis, prior to ... payment"); but see National Union Fire Ins. Co. v. Southeast Bank, N.A., 476 So.2d 766, 767 (Fla. 3d DCA 1985) (upholding dismissal of insurers' third-party subrogation complaints on basis that "[a] right to subrogation does not arise until judgment is entered or payment has been made"). Additionally, federal pleading rules permit the assertion of contingent cross-claims. See Fed.R.Civ.P. 13(g) (stating that a cross-claim against a co-party "may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant"); Providential Dev.

Co. v. U.S. Steel Co., 236 F.2d 277, 281 (10th Cir.1956) (Rule 13(g) "is not limited by text or purpose to definite or matured claims or causes of action[;]" rather, the rule "is broad enough to include a claim of a contingent nature, the ultimate outcome of which depends upon the determination of other features or issues in the case"); Glaziers & Glassworkers Union Local 252 Annuity Fund v. Newbridge Secs., Inc., 823 F.Supp. 1188, 1190 (E.D.Pa.1993) (Under Rule 13(g), "a cross-claim need not be mature at the time the cross-claim is originally asserted"); Royal Indem. Co. v. Deli By Foodarama, Inc., No. CIV.A.97–1267, 1999 WL 178543 *8 (E.D.Pa. Mar 31, 1999) (same, quoting Glaziers & Glassworkers); 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1431, at 240–41 (2d ed. 1990) (Rule 13(g) "does not require that the claim be mature at the time of pleading;" hence, "a cross-claim can be contingent upon the ultimate adjudication of the cross-claimant's liability to plaintiff"). Accordingly, OneBeacon is not entitled to dismissal of Amerisure's equitable subrogation and contribution claims.

■ A more difficult question is presented concerning Amerisure's ability to seek attorneys' fees pursuant to Fla. Stat. § 627.428. That statute provides, in pertinent part:

(1) Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any

---

4. In Galen Health Care, Morrison Assurance and Employers' Fire, the excess insurer actually made payment on the underlying claim. However, while these opinions discuss the fact of payment, they do not actually address the issue of whether an insurer may assert claims of equitable subrogation or contribution prior to making payment. Since payment had been made, the issue of whether the insurer could proceed in the absence of payment was not presented on appeal. Additionally, in Employers' Fire, the Florida Supreme

Court did state that a cause of action for contribution "only arise[s] from the contributor's ... payment (or other satisfaction) on the judgment or debt." 326 So.2d at 180. However, this statement was made in the context of determining when the statute of limitations began to run; again, Employers' Fire contains no discussion whatsoever concerning the separate issue of whether an excess insurer may pursue a contribution claim against a primary carrier without first making payment.

*named or omnibus insured or the named beneficiary* under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the *insured or beneficiary* a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.

Fla. Stat. § 627.428 (emphasis added). It is facially apparent from the text of § 627.428 that an excess insurer is not listed among the persons entitled to recover fees pursuant to the statute. Nevertheless, Amerisure contends that under Florida appellate decisions, "if an excess carrier is successful in a claim against a primary carrier, . . . the excess carrier has the right to recover attorney's fees under . . . § 627.428." Doc. 91 at 10.

The Court finds a split of authority exists on this issue in Florida. In *Aetna Ins. Co. v. Borrell–Bigby Elec. Co., Inc.,* 541 So.2d 139, 141 (Fla. 2d DCA 1989), Florida's Second DCA cited the Third DCA's opinion in *F. & R. Builders, Inc. v. United States Fid. & Guar. Co.,* 490 So.2d 1022 (Fla. 3d DCA 1986), for the proposition that "[w]hen an excess carrier obtains a judgment against the primary carrier for failure to honor the terms of its insurance contract the excess carrier is entitled to an attorney fee award" under Fla. Stat. § 627.428. However, the Third DCA later expressly receded from *F. & R. Builders* "to the extent that it holds that attorney's fees are recoverable in a declaratory action between insurers[.]" *Associated Elec. & Gas Ins. Servs., Ltd. v. Ranger Ins. Co.,* 560 So.2d 242, 243 (Fla. 3d DCA 1990). Moreover, the Third DCA expressly

adopted the concurring opinion in *State Farm Fire & Cas. Co. v. Pritcher,* 546 So.2d 1060 (Fla. 3d DCA 1989), in which Chief Judge Schwartz opined that *F. & R. Builders* "was wrongly decided insofar as it approves the recovery of attorney's fees expended in pursuing the action by the excess carrier against the primary insurer," 546 So.2d at 1062. *Associated Electric,* 560 So.2d at 243.

This Court determines that *Associated Electric* represents the better-reasoned view. The text of § 627.428 is clear; insurers are not among those entitled to recover fees. In initially passing the law, Florida's legislature could have included language in § 627.428 permitting insurers to recover attorneys' fees. Or, once Florida's appellate courts began to differ concerning this issue, the legislature could have amended the statute to provide clarification. The legislature not having seen fit to do so, this Court is unwilling to rewrite the statute.

■ The Court is mindful that Amerisure is asserting equitable subrogation and contribution claims, in addition to requesting declaratory relief. However, this is not a situation where Amerisure can claim that it has expended fees on behalf of an insured in defending an action against the insured that should have been defended by the primary carrier, and that it therefore "stands in the shoes" of the insured for purposes of § 627.428. *See Pritcher,* 546 So.2d at 1062 (Schwartz, C.J., specially concurring) (stating that "there is nothing to be subrogated to" where "the fees . . . were not expended by or on behalf of the insured in defending the primary action, but rather by the excess company itself in its separate case against the primary insurer which, as such, should have initially borne the defense expenses").[5] According-

---

5. As previously noted, the Third DCA later adopted Judge Schwartz's special concur-

rence. *Associated Electric,* 560 So.2d at 243.

ly, even if an excess insurer could be deemed to qualify for fees under § 627.428 in such a scenario, those circumstances do not apply here. For this additional reason, Amerisure is not entitled to seek fees under the statute. Accordingly, OneBeacon's motion will be granted insofar as it seeks dismissal of Amerisure's prayer for attorneys' fees pursuant to § 627.428.

## V. PLAINTIFF ESSEX'S NOTICE OF PARTIAL JOINDER IN ONEBEACON'S MOTION TO DISMISS COUNT II, ETC.,

The Court cannot conceive how Essex has standing to seek dismissal of Amerisure's cross-claim against OneBeacon, given that Amerisure's Third–Party Claims and Cross–Claim does not assert any claims against Essex. Accordingly, treated as a separate motion, this filing will be denied.

## VI. DEFENDANT AMERISURE'S MOTION TO STAY/ABATE PLAINTIFF'S CLAIM FOR "BAD FAITH" DAMAGES PENDING RESOLUTION OF INSURANCE COVERAGE DISPUTE

Amerisure contends that Essex's breach of contract claim seeks both contractual damages and extra-contractual damages, and that Essex must prove bad faith in order to recover extra-contractual damages. Amerisure also asserts: "Amerisure cannot have acted in bad faith in refusing to settle Essex's claim if its policy does not provide coverage for such claims. As a result, if Amerisure prevails on the coverage issue, Essex's claim for bad faith damages will be rendered obsolete." Doc. 84, ¶ 12, at 5. Continuing, Amerisure states:

Additionally, Amerisure will suffer substantial prejudice if it is forced to litigate Essex's claim for "bad faith" damages in tandem with the coverage claim. First, the issue of Essex's alleged business losses will cause the parties to divert substantial time and resources to an issue which is totally separate from and collateral to the issue of whether Amerisure's liability policy covers the construction deficiency claims asserted against Essex. Second, the evidence used by Essex to prove Amerisure's alleged bad faith will likely color the jury's view of the insurance coverage issues.

*Id.,* ¶ 13, at 5. Consequently, Amerisure asks this Court "to stay/abate Essex's claim for impairment to and/or loss of business damages (*i.e.,* Essex's 'bad faith' damages) pending the resolution of the parties' insurance coverage dispute." *Id.* at 13.

In response, Essex disputes Amerisure's "characterization of the damages Essex suffered as a foreseeable consequence of Amerisure's breach of the insurance contract, including the loss of its business," as "bad faith" damages. Doc. 121 at 2. Nevertheless,

In the interest of judicial economy, ... Essex agrees to abate its demand for consequential damages flowing from its insurers' breach of the policies until after this Court has confirmed that the subject policies provide coverage for the project owner's claims against Essex. Specifically, Essex stipulates to an abatement of its claims for loss of business damages, as they are described in Paragraph 18 of Essex's Complaint and to the extent they are set forth i[n] Essex's Rule 26 disclosures and discovery responses.

*Id.*

Notwithstanding the parties' agreement concerning Essex's request for abatement, the Court cannot accommodate the request consistent with the orderly and efficient management of this case. The issue of coverage will be determined, at the earliest, at the summary judgment phase of this case following completion of discovery,

or, at the latest, at the time of trial. If the Court stays discovery on the "damage to business" aspects of Essex's claim pending determination of coverage, and the coverage issue is not resolved in Amerisure's favor on summary judgment or at trial, the Court will then have to reopen discovery on the deferred aspects of the case. This has the potential for unreasonably delaying the ultimate resolution of the entire case. Accordingly, the Court will deny Amerisure's request. However, following the close of discovery, the parties may revisit the issue with the Court if they deem it appropriate.

## VII. THIRD–PARTY DEFENDANT NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA'S MOTION TO DISMISS COUNT II OF THE THIRD–PARTY COMPLAINT [6]

The only argument raised in this motion that merits mention is the contention that Amerisure has failed to state a claim for equitable subrogation or contribution because it has not alleged that it made payment to satisfy the underlying claim. The Court has already rejected this argument in ruling on OneBeacon's motion to dismiss. This motion will be denied on the same basis.

## VIII. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. Defendant OneBeacon Insurance Company's Motion for Partial Summary Judgment (Doc. 37), filed April 8, 2005, is DENIED.

2. Defendant OneBeacon Insurance Company's Motion to Dismiss Count II of Amerisure's Third Party Claims and Cross–Claim and Demand for Attorneys'

---

Fees Under Florida Statute § 627.428 (Doc. 72), filed July 19, 2005, is GRANTED IN PART AND DENIED IN PART.

The motion is GRANTED insofar as it seeks dismissal of Amerisure's claim for attorneys' fees pursuant to § 627.428. In all other respects, the motion is DENIED.

3. Plaintiff Essex Builders Group, Inc.'s Notice of Partial Joinder in OneBeacon's Motion to Dismiss, etc. (Doc. 88), filed August 2, 2005, is DENIED.

4. Defendant Amerisure Insurance Company's Motion to Stay/Abate Plaintiff's Claims for "Bad Faith" Damages Pending Resolution of Insurance Coverage Dispute (Doc. 84), filed July 29, 2005, is DENIED.

5. Third–Party Defendant National Union Fire Insurance Company of Pittsburgh, PA's Motion to Dismiss Count II of the Third–Party Complaint (Doc. 97), filed August 8, 2005, is DENIED.

---

6. The instant motion to dismiss was included in National Union's Answer. In the future, National Union shall file motions separately.