# Supreme Court of Florida

_____

No. SC15-1555
_____

**HOLMES REGIONAL MEDICAL CENTER, INC., et al.,**
Petitioners,

vs.

**ALLSTATE INSURANCE COMPANY, et al.,**
Respondents.

[July 13, 2017]

QUINCE, J.

This case is before the Court for review of the decision of the Fifth District

Court of Appeal in Allstate Insurance Co. v. Theodotou, 171 So. 3d 163 (Fla. 5th

DCA 2015). In its decision, the district court ruled upon the following question

which the court certified to be of great public importance:

> IS A PARTY THAT HAS HAD JUDGMENT ENTERED AGAINST
> IT ENTITLED TO SEEK EQUITABLE SUBROGATION FROM A
> SUBSEQUENT TORTFEASOR WHEN THE JUDGMENT HAS
> NOT BEEN FULLY SATISFIED?

Id. at 168. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. For the reasons

that follow, we answer the certified question in the negative and quash the decision

of the Fifth District.

# FACTS AND PROCEDURAL HISTORY

Benjamin Edward Hintz sustained head injuries when his scooter collided with an automobile driven by Respondent Emily Boozer. Theodotou, 171 So. 3d at 164. The car belonged to Boozer's father, Otto, who was insured by Respondent Allstate. Id. Hintz received medical treatment at Holmes Regional Medical Center (medical provider defendants) where, according to Respondents, his injuries were "exacerbated by medical negligence." Id.

Petitioner Douglas Stalley, guardian of Hintz's property, filed suit against Emily and Otto Boozer for damages. Id. Stalley successfully argued that Stuart v. Hertz Corp., 351 So. 2d 703 (Fla. 1977), "precluded the Boozers from presenting evidence that medical negligence was a contributing cause of Hintz's injuries." Id. The jury found the Boozers liable for Hintz's injuries and awarded Stalley $14,905,585.29, which was reduced by twenty-five percent to $11,179,188.98 due to Hintz's comparative negligence. Id. In August 2012, judgment was entered and Allstate paid $1.1 million, its policy limit. Id. The Boozers have not paid the remainder of the judgment. Id.

Following the personal injury verdict, Stalley filed a separate medical malpractice lawsuit against the medical provider defendants, who are also

Petitioners in this proceeding.  Id. at 165.  Stalley "sought recovery for the same

injuries involved in the initial lawsuit against the Boozers."[1]  Id.

Respondents Allstate and Emily Boozer were granted leave to intervene in

the lawsuit, and both parties filed complaints claiming they were entitled to

equitable subrogation from the medical provider defendants.  Id.  In response, the

medical provider defendants sought dismissal of the complaints because neither

Allstate nor Boozer had paid Hintz's damages in full.  Id.  The trial court agreed

with the medical provider defendants and dismissed Respondents' complaints with

prejudice.  Id.

> On appeal, the Fifth District considered whether
>
> [A]n initial tortfeasor or her insurer may assert an equitable
> subrogation claim against a subsequent tortfeasor when: (1) the initial
> tortfeasor was precluded from bringing the subsequent tortfeasor into
> the original personal injury action under Stuart v. Hertz, 351 So. 2d
> 703 (Fla. 1977); (2) judgment was entered against the initial tortfeasor
> for the full amount of the injured person's damages, regardless of the
> initial tortfeasor's portion of fault; and (3) that judgment has not been
> completely paid by the initial tortfeasor or her insurer.

Id. at 164.  In reversing the trial court's order, the district court found that "the

right to equitable subrogation arises when payment has been made or judgment has

---

1.  Stalley also filed a bad faith action against Allstate.  The case was tried in June 2016 and a jury found that Allstate did not act in bad faith.  See Stalley v. Allstate Ins. Co., No. 6:14-cv-1074-Orl-28DAB, 2016 WL 3282371 (M.D. Fla. June 10, 2016).  Stalley appealed, and the Eleventh Circuit affirmed.  See Stalley v. Allstate Ins. Co., No. 16-14816, 2017 WL 1033670 (11th Cir. Mar. 17, 2017).

been entered, so long as the judgment represents the victim's entire damages." Id. at 167. The court reasoned that "equity favors justice and fairness over formalistic legal rules," and that the need for liability to be correctly apportioned must be considered along with the victim's need to be made whole. Id. at 167-68. Recognizing that Florida courts have allowed subrogation claims to proceed on a contingent basis, the district court saw "no reason why Appellants' subrogation claim in this case should not be allowed to proceed in a similar manner." Id. at 167.

Petitioners Holmes Regional Medical Center and Douglas Stalley now argue that under this Court's long-standing precedent, an initial tortfeasor only has a subrogation claim against a subsequent tortfeasor after fully compensating the injured party. In response, Allstate and Emily Boozer contend that equitable subrogation is a flexible doctrine and equity requires that liability be properly apportioned among all negligent parties. Because the certified question presents a pure issue of law, the standard of review is de novo. Special v. West Boca Med. Ctr., 160 So. 3d 1251, 1255 (Fla. 2014).

**ANALYSIS**

In Stuart, this Court addressed "whether or not an active tortfeasor in an automobile accident may bring a third party action for indemnity against a physician for damages directly attributable to malpractice which aggravated the

plaintiff's injuries." 351 So. 2d at 704. The respondent in that case, Hertz, owned the automobile that collided with an automobile belonging to Mrs. Johnson. Id. Mrs. Johnson suffered orthopedic injuries from the crash and underwent surgery performed by the petitioner, Dr. Stuart. Id. During the surgery, Dr. Stuart accidentally severed Mrs. Johnson's carotid artery, which caused a neurological disability. Id. When Mrs. Johnson filed suit against Hertz, Hertz sought indemnity for any damages recovered because of the neurological injuries. Id. Dr. Stuart moved to dismiss the third party complaint, which the trial court denied. Id.

In reversing the trial court's order, we held that an initial tortfeasor is prohibited from presenting evidence of subsequent medical malpractice or filing a third-party complaint for alleged aggravation of injuries by medical providers. Id. at 706. We stated:

> An active tortfeasor should not be permitted to confuse and obfuscate the issue of his liability by forcing the plaintiff to concurrently litigate a complex malpractice suit in order to proceed with a simple personal injury suit. To hold otherwise would in effect permit a defendant to determine the time and manner, indeed the appropriateness, of a plaintiff's action for malpractice. This decision eliminates the traditional policy of allowing the plaintiff to choose the time, forum and manner in which to press his claim. (citation omitted).
>
> The choice of when and whether to sue his treating physician for medical malpractice is a personal one, which rightfully belongs to the patient. A complete outsider, and a tortfeasor at that, must not be allowed to undermine the patient-physician relationship, nor make the plaintiff's case against the original tortfeasor longer and more complex through the use of a third-party practice rule which was adopted for the purpose of expediting and simplifying litigation.

Id. We also expressed concern about "confusion and nonuniformity of application by the lower courts," complication of the issues, and prolonging the litigation. Id.

Justice Boyd concurred in part and dissented in part. Id. at 707. He explained:

> I dissent to the view that any active tortfeasor sued should be unable to shift an equitable portion of the judgment obligation to others causing or increasing the injuries and damages.
>
> Although respondent Hertz Corporation must not be permitted to join petitioner as a third party defendant, it should be permitted to allege and prove any malpractice and have the judgment amount reduced to the extent the malpractice contributed to the total amount of damages. It is fundamentally unfair and unjust to require Hertz to pay for the negligence of petitioner, if any. If the injured person, Mrs. Johnson, does not wish to join her doctor in the suit that should be her privilege, but she should not recover from Hertz the full damages unless Hertz is the only tortfeasor.

Id. at 707-08.

> Justice Overton also dissented and wrote:
>
> A plaintiff should not be allowed to recover for the same wrong from both tortfeasors, which may be possible under the majority opinion as I understand it. Clearly one tortfeasor should not be responsible for all the injuries without the right of indemnification for the identifiable consequences of another's wrong.

Id. at 708.

We later addressed the concerns raised by Justice Boyd and Justice Overton in Underwriters at Lloyds v. City of Lauderdale Lakes, 382 So. 2d 702 (Fla. 1980). In Lloyds, the City of Lauderdale Lakes settled with a victim for all injuries

- 6 -

flowing from an automobile accident and for the treatment thereof.  Id. at 703.

Following settlement, the City sought indemnification from the doctor.  Id.  Due to

this Court's decision in Stuart, the City attempted to amend its complaint and sue

the doctor under a theory of subrogation.  Id.  "The trial court denied the city's

motion to amend and granted summary judgment for the defendant insurance

company."  Id.  The Fourth District reversed the trial court and certified the

following question as one of great public interest:

> DOES THE DECISION IN STUART V. HERTZ BAR A
> SEPARATE LAWSUIT BY THE INITIAL TORTFEASOR
> AGAINST A SUCCESSOR TORTFEASOR WHO AGGRAVATES
> THE ORIGINAL INJURIES?

Id.

In answering the certified question in the negative, we considered whether

"it is fair and equitable for such a tortfeasor to have to pay a sum greater than

should have flowed from an accident without thereafter giving him some recourse

against the agency exacerbating his liability?"  Id. at 704.  In order to "preclude a

negligent doctor from escaping the responsibilities for his actions," we provided

the remedy of equitable subrogation.  Id.  We explained that subrogation is an

equitable doctrine that allows the initial tortfeasor to be placed in "the shoes of"

the plaintiff.  Id. (citing 30 Fla. Jur. Subrogation § 11).  It is a legal device

"founded on the proposition of doing justice without regard to form, and was

designed to afford relief where one is required to pay a legal obligation which

- 7 -

ought to have been met, either wholly or partially, by another." Id. (citations omitted). Additionally, "a subrogation suit is a separate, independent action against a subsequent tortfeasor by the initial tortfeasor. The injured party, having received full compensation for all injuries, is not a party to the litigation and is spared the trauma of an extensive malpractice trial." Id. In so holding, we "aligned Florida with jurisdictions relying upon subrogation as a remedy of affording an initial tortfeasor equitable apportionment of liability when a victim's injuries have been negligently aggravated by an attending doctor." Id. (citations omitted).

We later expounded on what was required for an initial tortfeasor to assert an equitable subrogation claim in Dade County School Board v. Radio Station WQBA, 731 So. 2d 638 (Fla. 1999), where we held that equitable subrogation is "generally appropriate" when five factors are satisfied:

> (1) the subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a volunteer, (3) the subrogee was not primarily liable for the debt, (4) the subrogee paid off the entire debt, and (5) subrogation would not work any injustice to the rights of a third party.

Id. at 646. In that case, we resolved a conflict between the Third District in Dade County School Board v. Radio Station WQBA, 699 So. 2d 701 (Fla. 3d DCA 1997) and the Fifth District in West American Insurance Co. v. Yellow Cab Co. of Orlando, Inc., 495 So. 2d 204 (Fla. 5th DCA 1986). In WQBA, the Third District

- 8 -

had concluded that partial payment was enough to allow a remedy of equitable subrogation. 699 So. 2d at 703. The Fifth District in West American, however, stated that the party claiming subrogation had to pay the debt in full. 495 So. 2d at 207. Because we "disagree[d] with the [Third District's] liberal application of the equitable subrogation doctrine," we approved the decision of the Fifth District. WQBA, 731 So. 2d at 646.

We pointed out that, in West American, "central to the court's application of equitable subrogation was the fact that West American secured a release which included Yellow Cab and that West American paid one hundred percent of the debt." WQBA, 731 So. 2d at 647. We reasoned that, because equitable subrogation puts "the person discharging the debt . . . in the shoes of the person whose claim has been discharged, [it] would only be proper if it can be established that [WQBA] paid the entire debt owed to a particular plaintiff and that in doing so, [WQBA] obtained a release for DCSB [Dade County School Board] from the plaintiff." Id.

Our decision in WQBA was consistent with long-established law that "[u]ntil the obligation is fully discharged, the obligee is himself entitled to enforce the balance of his claim, and the person whose property has been used in discharging only a part of the claim is not entitled to occupy his position." Restatement (First) of Restitution §162 com. c. (Am. Law Inst. 1937). Other

- 9 -

district courts have held similarly. See U.S. Fid. & Guar. Co. v. Essex Ins. Co., 188 So. 3d 906, 907 (Fla. 1st DCA 2016) (no equitable subrogation where excess insurer "did not pay the entire settlement in the underlying tort litigation"); Goldberg v. State Farm Auto. Mut. Ins. Co., 922 So. 2d 983 (Fla. 4th DCA 2005) (insurer that paid insured's passenger not entitled to subrogation against second driver where it did not show that it paid all of the passenger's damages and obtained release of second driver); Collins v. Wilcott, 578 So. 2d 742, 744 (Fla. 5th DCA 1991) ("[T]he right of subrogation does not exist until one tort-feasor has completely discharged the obligation of all tort-feasors."); Fla. Farm Bureau Ins. Co. v. Martin, 377 So. 2d 827 (Fla. 1st DCA 1979) (no subrogation for fire insurer where insured recovered less from tortfeasor than insured's total damages).

In the instant case, the Fifth District distinguished cases cited by Petitioners for the proposition that equitable subrogation requires full payment by stating that the cases either (1) involved settlements "where the party seeking equitable subrogation settled with the victim for only the portion of the injury directly attributable to it," or (2) did "not involve a Stuart initial tortfeasor/subsequent tortfeasor situation" where the victim's injuries were made worse by a doctor's negligence. Theodotou, 171 So. 3d at 166. In doing so, the Fifth District ignored the underlying principle of those cases: that the victim had been fully compensated by the initial tortfeasor before the initial tortfeasor could assert an equitable

- 10 -

subrogation claim. While there was no settlement offer in this case, in order for the Respondents to "step in[to] the shoes" of the plaintiff, they must first fully discharge the debt. Although Respondents argue that some district courts have held that an equitable subrogation claim arises once judgment has been entered, that language, as acknowledged by the Fifth District, is dicta. See, e.g., Caccavella v. Silverman, 814 So. 2d 1145, 1147 (Fla. 4th DCA 2002) ("When an initial tortfeasor is held liable for the entirety of the plaintiff's damages, his remedy is an action for equitable subrogation against the subsequent tortfeasor."); Nat'l Union Fire Ins. Co. v. Se. Bank, N.A., 476 So. 2d 766, 767 (Fla. 3d DCA 1985) ("A right to subrogation does not arise until judgment is entered or payment has been made.").

Because a claim of equitable subrogation requires payment of the entire debt, Respondent Boozer's argument that she may be substituted for Hintz in the malpractice action is meritless, as she has paid no part of the $11 million judgment against her. Additionally, Respondent Allstate's argument that it has a claim by virtue of its $1.1 million dollar payment fails, as partial payment does not discharge the entire debt to the injured party and therefore does not give rise to an equitable subrogation claim. See Cleary Bros. Constr. Co. v. Upper Keys Marine Constr., Inc., 526 So. 2d 116, 117 (Fla. 3d DCA 1988) ("No rights of subrogation arise from a partial satisfaction of an obligation."); see also Rubio v. Rubio, 452

- 11 -

So. 2d 130, 132 (Fla. 2d DCA 1984) ("[T]he insurer has no right as against the insured where the compensation received by the insured is less than his loss." quoting Couch on Insurance, 2d § 61.64 (rev. ed. 1983)).  This is because "the creditor cannot equitably be compelled to split his or her securities and give up control of any part until he or she is fully paid."  16 Couch on Ins. 3d § 223:22 (Rev. ed. 2016).

Furthermore, allowing Petitioner Stalley, on behalf of Hintz, to pursue a medical malpractice claim against the medical provider defendants without Respondents' intervention would neither violate the doctrine of election of remedies nor permit Hintz to obtain a double recovery.  Although the Fifth District did not expressly use the term "election of remedies," it was at the foundation of the court's reasoning in the instant case:

> Stuart makes clear that an injured party can <u>choose</u> to sue only the initial tortfeasor and seek recovery for all the injuries resulting from both torts . . .  <u>Or</u> the injured party can first recover from the initial tortfeasor for the injuries caused solely by the original tort and then seek recovery from the subsequent tortfeasors for the injuries caused, or aggravated by, their negligence.

Theodotou, 171 So. 3d at 165 (emphasis added).

> Under Stuart, Stalley <u>made a decision</u> to recover from only the initial tortfeasor.

Id. (emphasis added) (citations omitted).

> Here, the plaintiff <u>chose</u> the manner of the litigation.  He <u>elected to sue</u> only the Boozers, presumably knowing that they could not afford

- 12 -

to pay a multi-million dollar judgment.  He then <u>chose</u> to sue the Medical provider defendants, leading to, ironically, his involvement in what could become an "extensive" medical-malpractice trial.  The intervention of the initial tortfeasor into that lawsuit is a <u>consequence of these choices</u>.

<u>Id.</u> at 168 n.3 (emphasis added).  The Fifth District here inaccurately described

Hintz's decision to sue Boozer first as "a decision to recover from only the initial

tortfeasor."  <u>Id.</u> at 166.  However, a plaintiff is not precluded from suing an initial

tortfeasor before suing a negligent medical provider.  <u>See, e.g.</u>, <u>Barnes v. Meece</u>,

530 So. 2d 958, 959 (Fla. 4th DCA 1988) (holding plaintiff entitled to bring

separate, simultaneous suits against initial tortfeasor and negligent treatment

providers without having to litigate the malpractice issue in the tort suit); <u>Am.</u>

<u>Process Co. v. Florida White Pressed Brick Co.</u>, 47 So. 942, 944 (Fla. 1908)

("Where the law affords several distinct, but not inconsistent, remedies for the

enforcement of a right, the mere election or choice to pursue one of such remedies

does not operate as a waiver of the right to pursue the other remedies.").  Contrary

to the Fifth District's reasoning, Hintz did not decide to recover only from the

initial tortfeasor.  Instead, he decided to sue the initial tortfeasor <u>first</u>.  That was not

an election of remedies.  Hintz's remedy against Boozer is not inconsistent with

the remedy he seeks now against the medical provider defendants, and the

judgement remains unsatisfied.

The election of remedies doctrine is intended "to prevent double recoveries for a single wrong." Liddle v. A.F. Dozer, Inc., 777 So. 2d 421, 422 (Fla. 4th DCA 2000) (quoting Goldstein v. Serio, 566 So. 2d 1338, 1339 (Fla. 4th DCA 1990)). It applies in two circumstances, neither of which are present in this case. First, it can apply when the plaintiff has obtained a judgment on one of two inconsistent theories. The facts underlying the claims must be "opposite and irreconcilable." See Barbe v. Villenueve, 505 So. 2d 1331, 1333 (Fla. 1987). Remedies are only inconsistent if they cannot logically exist on the same facts. Heller v. Held, 817 So. 2d 1023, 1026 (Fla. 4th DCA 2002). Where, as here, the claims rely on the same facts and the plaintiff seeks further relief consistent with the relief already given, the remedies are not inconsistent. See Klondike, Inc. v. Blair, 211 So. 2d 41, 42-43 (Fla. 4th DCA 1968) (holding that unsatisfied judgment on note was not inconsistent with claim for foreclosure of mortgage securing it and was not an election).

Second, if the remedies are consistent, only "full satisfaction" of the claim will constitute an election of remedies. Thus, a party may get more than one judgment, so long as there is only one recovery. In Rodriguez ex rel Rodriguez v. Yount, 623 So. 2d 618, 619 (Fla. 4th DCA 1993), the court quashed the abatement of a medical malpractice action pending resolution of a bad faith action against the insurer of an initial tortfeasor, holding that, "even if the damages were identical,

there is no bar to proceed against a concurrent or subsequent [tortfeasor] where the prior judgment remains uncollected." Id. at 619. See also Heller, 817 So. 2d at 1027 (holding no election where "record suggests that the judgment cannot be collected"). Satisfaction of the judgment is required because the doctrine "can serve as an instrument of injustice when an election of a remedy turns out to be unavailable." Sec. & Inv. Corp. of the Palm Beaches v. Droege, 529 So. 2d 799, 802 (Fla. 4th DCA 1988). Thus, we held in Junction Bit & Tool Co. v. Village Apartments, Inc., 262 So. 2d 659, 660 (Fla. 1972), that "the issue of an election of remedies was . . . of no consequence when no real remedy resulted." As applied to the instant case, Hintz has received only an unsatisfied judgment and a payment from Allstate of less than one tenth of his total damages. There has been no "full satisfaction."

Moreover, the "one-action rule" on which Allstate relies does not support its argument for intervention into Hintz's medical malpractice action. The rule against splitting a cause of action applies only to a "single wrongful act." Tyson v. Viacom, Inc., 890 So. 2d 1205, 1210-11 (Fla. 4th DCA 2005) (quoting Froman v. Kirkland, 753 So. 2d 1116 (Fla. 4th DCA 1999)). Here, Boozer's negligence and the medical provider defendants' malpractice are separate wrongful acts. Hintz was injured by both. As previously stated, Hintz is allowed to sue the initial

tortfeasor and the medical provider defendants separately.  See Barnes, 530 So. 2d at 9; see also Rodriguez, 623 So. 2d at 618.

Similarly, Respondent Allstate's reliance on developments in the law, such as the law surrounding D'Amario v. Ford Motor Co., 806 So. 2d 424 (Fla. 2001), and the comparative fault statute do not entitle it or Boozer to equitable subrogation without first paying the judgment in full.  First, D'Amario is an automobile crashworthiness case.  There, we held that apportionment of fault generally will not apply in such situations, as the manufacturer "may not be held liable for the injuries caused by the initial accident."  806 So. 2d at 426.  The Legislature thereafter amended the comparative fault statute to require the jury, "in a products liability action," to "consider the fault of all persons who contributed to the accident when apportioning fault."  Ch. 2011-215 § 1, Laws of Florida (codified at § 768.81(3)(b), Fla. Stat. (2011)).

Second, the comparative fault statute has nothing to do with the certified question before this Court.  Respondents did not base their appeal to the Fifth District on an argument that this Court should recede from Stuart in light of the comparative fault statute or for reasons of fairness.  Nor did the Fifth District, in its certified question to this Court, ask whether Stuart should be receded from in light of the comparative fault statute.  However, Florida appellate courts that have had the opportunity to address the issue directly have concluded that the comparative

fault statute did not legislatively overrule Stuart. See, e.g., Caccavella, 814 So. 2d at 1149 (holding § 768.81, Fla. Stat. was not broad enough to overrule Stuart, because Stuart context does not involve joint and several liability). The Fourth District then certified this question in Caccavella, and again in Letzter v. Cephas, 792 So. 2d 481, 488 (Fla. 4th DCA 2001) (posing question but not passing upon it). We dismissed review of Cephasv. Letzter, 843 So. 2d 871 (Fla. 2003), and Caccavella was voluntarily dismissed, Caccavella v. Silverman, 860 So. 2d 976 (Fla. 2003).

Finally, while the Fifth District held that "the right to equitable subrogation arises when payment has been made or judgment has been entered," it did not state that Boozer could substitute Hintz, or that Boozer and Allstate alone could pursue the medical provider defendants. Theodotou, 171 So. 3d at 167. Instead, the Fifth District found that Respondents' subrogation claims could proceed on a contingent basis. Id. In so holding, the district court relied on the Fourth District's decision in Gortz v. Lytal, Reiter, Clark, Sharpe, Roca, Fountain & Williams, 769 So. 2d 484 (Fla. 4th DCA 2000). In Gortz, the district court allowed a defendant law firm that was sued for legal malpractice to bring a third party claim against another law firm alleging equitable subrogation without having paid the entire claim. Id. at 485. However, in Gortz, the party claiming subrogation was already a defendant in the case, and was bringing the claim as a third party claim under Florida Rule of Civil

- 17 -

Procedure 1.180, which allows a defendant to sue a third party "who may be liable" for all or part of the plaintiff's claim.

Gortz does not apply here, in part because no third party complaint is involved and because this Court ruled in Stuart that Rule 1.180 does not allow an initial tortfeasor to file a third party complaint against subsequent medical provider defendants for equitable subrogation. Stuart, 351 So. 2d at 706. That issue was not present in Gortz. Even though not applicable, the court took pains to point out that the trial court had discretion to sever the claims if the defendants "overly complicate the litigation," or if they "unfairly prejudice plaintiffs in the orderly presentation of their claims." Gortz, 769 So. 2d at 488 (quoting Attorneys' Title Ins. Fund Inc. v. Punta Gorda Isles, Inc., 547 So. 2d 1250, 1252-53 (Fla. 2d DCA 1989)). In the case before us, allowing the Respondents to bring contingent subrogation claims would, Petitioners argue, overly complicate the litigation and unfairly prejudice Hintz. We agree.

## CONCLUSION

The Fifth District erred in holding that Respondents could assert claims for contingent equitable subrogation without first paying the judgment in full. As such, we answer the certified question in the negative, reverse the district court's decision, and remand the case to reinstate the dismissal of the equitable subrogation claims.

- 18 -

It is so ordered.

LABARGA, C.J., and PARIENTE, and LEWIS, JJ., concur.
PARIENTE, J., concurs with an opinion, in which LEWIS, J., concurs.
POLSTON, J., dissents with an opinion.
LAWSON, J., dissents with an opinion, in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I concur fully in the majority opinion. I write separately to address the argument advanced by Justice Lawson in his dissent concerning fairness and efficiency as a reason to allow "contingent equitable subrogation." Dissenting op. at 25 (Lawson, J.). In this case, a seriously injured plaintiff obtained a judgment against the initial tortfeasor, Emily Boozer, of over $11 million. However, to date, the only portion of the judgment that has been paid came from the initial tortfeasor's insurer, Allstate, which paid its policy limit of $1.1 million, leaving an unsatisfied judgment of over $10 million. The vast majority of the damages were economic, with the jury allocating $9 million to future care and treatment.

Justice Lawson mainly contends that the majority opinion is unfair to the initial tortfeasor. His arguments, however, all flow from an incorrect assumption—that the initial tortfeasor has been "legally 'placed "in the shoes" of the plaintiff.' " Dissenting op. at 38 (Lawson, J.) (quoting Underwriters at Lloyds v. City of Lauderdale Lakes, 382 So. 2d 702, 704 (Fla. 1980)). That assumption is

- 19 -

belied by the critical fact upon which the majority's reasoning is based—the initial tortfeasor has yet to satisfy the judgment. Yet, Boozer and Allstate took the position before the trial court that they, and not the injured plaintiff, were entitled to be substituted as the sole plaintiffs in the injured plaintiff's medical malpractice action.

With a substantial unsatisfied judgment against the initial tortfeasor, the seriously injured plaintiff with millions of dollars in future medical care has not yet begun to be made whole. Boozer, the initial tortfeasor, has paid nothing and will likely never be able to fully satisfy the judgment against her. According to a deposition in this case, Boozer is a young mother of two, a student, and has no current income of her own. As Boozer stated in her initial brief before the Fifth District Court of Appeal she, "[l]ike most Floridians, . . . does not have the financial means to pay such an enormous judgment."

Boozer has not earned the right to stand in the plaintiff's shoes. The injured plaintiff still occupies his own shoes. As the injured plaintiff argues, "it is Mr. Hintz who is walking in those painful shoes, suffering the continuing effects—economic and emotional—of Ms. Boozer's negligence, and who has not been compensated." Initial Br. of Pet'r Douglas Stalley, at 38-39.

The plaintiff has never opposed intervention, just the assertion that the tortfeasors should be substituted for the plaintiff or allowed to litigate alongside of

the plaintiff. While the plaintiff objects to the initial tortfeasor and her insurer being permitted to litigate alongside him, the plaintiff in his brief concedes that Boozer and Allstate have an interest in the litigation:

> Nor does Mr. Hintz have any interest in depriving the Respondents of an opportunity to be heard. From the outset, Mr. Hintz has agreed that Respondents should be allowed to intervene. They should be entitled to notice of any settlement. If there is an actual recovery of money against the medical providers, Allstate may assert a lien or setoff, the details of which can be litigated post trial, taking into account how much of the damages were actually caused by the medical providers, how much Mr. Hintz is actually able to recover, the cost of procuring the recovery, and the extent to which the Respondents assisted or interfered with Mr. Hintz's recovery efforts, and any other equitable considerations that might apply. Once Mr. Hintz's damages have been paid in full, Ms. Boozer may also have a remedy under Fla. R. Civ. P. 1.540(b)(5), which provides for relief from a judgment if it has been satisfied, or if it "is no longer equitable that the judgment or decree should have prospective application."

Initial Br. of Pet'r Douglas Stalley, at 49.

On the other hand, allowing the initial tortfeasor to intervene in the medical malpractice case before the jury, without the plaintiff's agreement, carries the real potential of complicating the issues and confusing the jury in this new, separate case. There is no doubt that the jury would speculate as to why the initial tortfeasor is not also being sued, or whether there had been a previous lawsuit against the initial tortfeasor. Would the presence of the initial tortfeasor be explained to the jury? Would the initial tortfeasor be able to relitigate the issue of damages? While Justice Lawson makes the assumption that the initial tortfeasor

- 21 -

would assist the injured party in his lawsuit against the Medical Provider defendants, it remains unclear what the rights of the initial tortfeasor would be in the subsequent litigation—would she be entitled to her own set of experts; or could she ride on the plaintiff's coattails bearing none of the economic burden of the cost of the litigation; would she have a right to examine and cross-examine the witnesses; would the plaintiff be required to partner with her throughout the litigation such that the plaintiff would lose the ability to control the litigation? Justice Lawson's proposed solution of crafting a limiting instruction to alleviate this confusion is unsatisfactory in light of the myriad problems that could arise. See dissenting op. at 41 (Lawson, J.).

Apparently, Justice Lawson's primary concern is the possibility of a settlement with the Medical Provider defendants, such that the plaintiff would receive a windfall and the initial tortfeasor would not receive the benefit of a reduction in the outstanding judgment. But of course, any amount paid by the Medical Provider defendants, either through judgment or settlement, would result in a reduction in the overall amount owed by the initial tortfeasor. As the plaintiff points out, nothing will prevent the initial tortfeasor or Allstate from participating in and arguing for a proportionate reduction in the judgment against the initial tortfeasor, if there is a settlement with or judgment against the Medical Provider defendants. Further, because there is a guardianship over the plaintiff's property,

any settlement must be approved by the probate court at which point the initial tortfeasor and Allstate could intervene.

In addition, Justice Lawson fails to consider that the injured plaintiff has a real incentive to obtain the maximum amount against the Medical Provider defendants, which would inure to the benefit of the tortfeasor by reducing the total amount of the judgment against her. Conversely, as pointed out by Holmes Medical Center, one of the Medical Provider defendants, a holding allowing contingent equitable subrogation would be a disincentive to the initial tortfeasor and her insurer to first pay the entire judgment and discharge the debt if they could, instead, intervene in the medical malpractice case by filing a contingent equitable subrogation claim.[2]

When all of the equitable considerations are taken into account, the balance of the equities fall to the injured plaintiff. Arguing this case both before the Fifth District Court of Appeal and before this Court, Boozer and Allstate quoted case law stating that the purpose of equitable subrogation is to "do perfect justice." "What [Boozer and Allstate] seek here is not perfect and it is not justice." Initial Br. of Pet'r Douglas Stalley, at 46. I fully concur in the majority opinion.

LEWIS, J., concurs.

---

2. Both the severely injured plaintiff, Benjamin Edward Hintz, who appears through his guardian, Douglas Stalley, as well as the Medical Provider defendants, and the Florida Hospital Association as amicus, oppose the intervention of Emily Boozer and Allstate in the malpractice action.

POLSTON, J., dissenting.

As explained by the Fifth District,

> Here, the Boozers did not settle with Stalley, nor were they held liable, for only their portion of liability. Rather, they were held liable for all of Hintz's injuries resulting from the accident. Judgment was entered against them for over $11 million. That judgment is fully enforceable by Stalley and has various severe consequences for Boozer. If Boozer was not solely liable, then, in fairness, she ought to be able to seek subrogation from the subsequent tortfeasors. Allstate should also have the opportunity to seek equitable subrogation because it has potentially paid more than its fair share. Put simply, we agree with Appellants that the right to equitable subrogation arises when payment has been made or judgment has been entered, so long as the judgment represents the victim's entire damages.

Allstate Ins. Co. v. Theodotou, 171 So. 3d 163, 167 (Fla. 5th DCA 2015); see, e.g., Caccavella v. Silverman, 814 So. 2d 1145, 1147 (Fla. 4th DCA 2002) ("When an initial tortfeasor is held liable for the entirety of the plaintiff's damages, his remedy is an action for equitable subrogation against the subsequent tortfeasor."); Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Se. Bank, N.A., 476 So. 2d 766, 767 (Fla. 3d DCA 1985) ("A right to subrogation does not arise until judgment is entered or payment has been made.").

I agree with the Fifth District's above explanation and would answer the certified question in the affirmative.

LAWSON, J., dissenting.

I dissent because the Court answers the wrong question and because the answer, which effectively leaves the initial tortfeasor without a remedy, is contrary to the basic tenets underlying common law tort theory. I would rephrase the question to match the facts of this case, to read as follows:

> WHEN AN INJURED PARTY SECURES A JUDGMENT AGAINST AN INITIAL TORTFEASOR AND THEN SUES A SUBSEQUENT TORTFEASOR TO RECOVER THE SAME DAMAGES, MAY THE INITIAL TORTFEASOR JOIN THE ACTION AND FILE A CONTINGENT EQUITABLE SUBROGATION CLAIM?

I would answer this rephrased question affirmatively. To explain why, I will first define two relevant terms; then, explore the "first principles" of Florida tort law and related policy decisions that lay the framework within which we must decide this case; and, finally, address how, only by disregarding these principles and the policy choices that they informed, does the majority deny the initial tortfeasor access to a contingent equitable subrogation claim.

## I. RELEVANT TERMS

"Joinder" is "[t]he uniting of parties or claims in a single lawsuit." Black's Law Dictionary 965 (10th ed. 2014).

"Subrogation" is "[t]he substitution of one party for another whose debt the party pays . . . ." Id. at 1654. "Conventional subrogation" is "[s]ubrogation that arises by contract." Id. at 1655. "Equitable subrogation" is "[s]ubrogation that arises by operation of law or by implication in equity to prevent fraud or injustice."

- 25 -

Id. Similar to other equitable remedies, equitable subrogation is "founded on the proposition of doing justice without regard to form." Underwriters at Lloyds v. City of Lauderdale Lakes, 382 So. 2d 702, 704 (Fla. 1980). The theory is that because the initial tortfeasor has become legally liable for damages that should rightly be owed by the subsequent tortfeasor to the plaintiff, the initial tortfeasor "is placed 'in the shoes' of the plaintiff" and can bring what would have been the plaintiff's cause of action against the subsequent tortfeasor. Id. (quoting 30 Fla. Jur. Subrogation § 11).

## II. RELEVANT LAW

### A. First Principles of Tort Law

The "first principles"[3] undergirding our modern tort system are clear: "Tort law represents the way in which we draw lines around acceptable and unacceptable non-criminal behavior in our society. Torts are designed to encourage socially beneficial conduct and deter wrongful conduct." Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1105 (Fla. 2008) (quoting Denver Publ'g Co. v. Bueno, 54 P.3d 893, 897-98 (Colo. 2002)). " '[T]he primary purpose of tort law is "that wronged

---

3. See generally David G. Owen, The Moral Foundations of Products Liability Law: Toward First Principles, 68 Notre Dame L. Rev. 427, 501 n.324 (1993) (quoting Aristotle for the point that "first principles" (i.e., the reasons for a legal theory) have "a vital influence upon all that follows from them . . . and [are] a means at arriving at a clear conception of many points which are under investigation") (citation omitted).

persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." ' " Clay Elec. Coop., Inc. v. Johnson, 873 So. 2d 1182, 1190 (Fla. 2003) (quoting Weinberg v. Dinger, 524 A.2d 366, 375 (N.J. 1987)). Most basically, when someone is harmed by the wrongful acts of others, we try to adjudicate the dispute as fairly as possible to all parties and as efficiently as possible for society. Id.

I will focus first on the goal of fairness to all parties. That basic goal breaks down into two principles that are often at odds. The first is that an injured party should be "made whole" or fully and fairly compensated for the harm caused by others. See 25 C.J.S. Damages § 118 (June 2017 Update) ("The level of compensatory damages is determined with reference to the plaintiff's loss, and damages should compensate for an individual's loss and no more. The law will not put the injured party in a better position than he or she would be in had the wrong not been done. Thus, an injured party is to be made as nearly whole as possible . . . .") (footnotes omitted). The second is that a tortfeasor should not be required to pay for harm that he or she did not cause. See Restatement (Third) of Torts: Apportionment of Liab. § 26 cmt. a (2000) ("No party should be liable for harm it did not cause . . . ."). These appear to be the most basic "first principles" of fairness to the parties in modern tort law. In section III of this opinion, I will refer

to these principles using the labels "fair recovery" and "fair apportionment," respectively.

There also seems to be a somewhat unrelated basic principle that an injured party should not be forced to bring a claim against a party that the injured party does not want to sue. I will refer to this as the "plaintiff's choice" principle. See Stuart v. Hertz Corp., 351 So. 2d 703, 706 (Fla. 1977) ("The choice of when and whether to sue his treating physician for medical malpractice is a personal one which rightfully belongs to the patient.").

Finally, there appears to be a general preference that related claims be adjudicated in one proceeding when possible. See 35A C.J.S. Federal Civil Procedure § 134 (June 2017 Update) (explaining that courts generally have a strong policy favoring the inclusion of "all persons materially interested, either legally or beneficially, in the subject matter of a suit . . . so that there can be a complete decree which will bind them all and so that the court can do complete justice") (footnote omitted); 5 Fla. Prac., Civil Practice §15:8 (2016-17 ed.) ("Florida courts have expressed a general preference for the resolution of multiple claims in a single trial."). Although this preference appears primarily rooted in society's concern for efficiency, it also strongly serves the interests of the parties by avoiding the risk of inconsistent verdicts and saving costs for them as well. Id. I will refer to this last principle in section III as the "joinder" principle.

## B. The Swing Between Competing Principles & General Choice of Comparative Negligence

To fully understand the rephrased question, it is extremely helpful to have at least some basic understanding of how the law has shifted over time as our courts and legislatures—guided by the "first principles" discussed above—have attempted to be as fair as possible to all parties and to the public. I start with the rule of "contributory negligence" that "arose in England in the early nineteenth century, soon spread to the United States, and flowered throughout the common law world with the growth of the industrial revolution." David C. Sobelsohn, Comparing Fault, 60 Ind. L.J. 413, 413 (1985) (footnotes omitted). The "contributory-negligence doctrine" is a rule of law that "completely bars a plaintiff's recovery if the damage suffered is partly the plaintiff's own fault." Black's Law Dictionary 403 (10th ed. 2014). This rule protected tortfeasors from liability for harm that they did not cause and reduced costs for the civil justice system. But, these goals, achieved through "all-or-nothing" recovery, Sobelsohn, supra, at 413, were met at a complete cost of the other "first principle" of making the injured party whole for damages caused by others.

Between 1945 and the mid-1970s, England and most jurisdictions in the United States replaced the contributory negligence doctrine with a doctrine of "comparative negligence" by which a plaintiff's recovery against a single tortfeasor would be reduced to the extent that his or her own actions caused the

injury for which he or she sought to recover from the defendant. Id. at 414-15 & n.16; see also Black's Law Dictionary 341-42 (10th ed. 2014) (defining the "comparative-negligence doctrine" as "[t]he principle that reduces a plaintiff's recovery proportionally to the plaintiff's degree of fault in causing the damage, rather than barring recovery completely" and noting that most states have statutorily adopted the doctrine). Florida abandoned contributory negligence for comparative negligence in 1973. See Hoffman v. Jones, 280 So. 2d 431, 438 (Fla. 1973).

Cases involving two or more tortfeasors are more complicated and have spawned various rules in various jurisdictions at various times to address the "first principles." Focusing on a desire to make the injured party whole, a doctrine of joint and several liability began to be widely applied in many contexts involving multiple tortfeasors. See generally, Gerald W. Boston, Apportionment of Harm in Tort Law: A Proposed Restatement, 21 U. Dayton L. Rev. 267 (1996). Under this doctrine, a tortfeasor is held fully liable for all damages caused by all tortfeasors. This doctrine promotes the principle of making an injured party whole but usually results in a tortfeasor compensating the plaintiff for harm that the tortfeasor did not cause. See Agency for Health Care Admin. v. Associated Indus. of Fla., Inc., 678 So. 2d 1239, 1257 (Fla. 1996) (explaining that joint and several liability "allows a

claimant to recover all damages from one of multiple defendants even though that defendant may be the least responsible defendant in the cause").

While some jurisdictions applied joint and several liability, other jurisdictions applied comparative negligence principles to the multiple-tortfeasor problem. See Boston, supra, at 291. And, ultimately, almost all jurisdictions ended up selecting comparative negligence principles over joint and several liability as the fairest system overall, in most cases. See, e.g., 86 C.J.S. Torts § 96 (June 2017 Update) ("Where the tortfeasors have not acted in concert and have caused separate and distinct harms or injuries, each tortfeasor is only severally liable for the damage caused by its own tortious conduct."). Now, in most cases, "an injury caused by two or more persons should be apportioned according to their respective shares of comparative responsibility." Restatement (Third) of Torts: Apportionment Liab. § 26 cmt. a. (2000). In Florida, these general principles were codified in statute when the Legislature adopted the "Uniform Contribution Among Tortfeasors Act" in 1975. See ch. 75-108, Laws of Fla. (creating § 768.31, Fla. Stat. (1975)).[4]

---

4. I fully understand that I am blurring important concepts here and that there is a vast difference between apportioning damages based upon cause (the common law approach) and apportioning damages based upon fault (the statutory approach in Florida and most states). But, that is a complicated subject that would take us far afield of the question posed in this case.

The law in Florida also appears to have developed to address the competing efficiency and plaintiff's choice concerns in a fair way. A plaintiff can join all tortfeasors in one action (assuming that the tortfeasor can be found and a Florida court has personal jurisdiction over the party). See Fla. R. Civ. P. 1.210. And, if a plaintiff has no desire to sue a tortfeasor, the other defendant tortfeasors can still have the absent tortfeasor included on the verdict form so that each defendant is held responsible only for the harm attributable to its conduct. See Fabre v. Marin, 623 So. 2d 1182, 1185-87 (Fla. 1993), receded from on other grounds by Wells v. Tallahassee Mem'l Reg'l Med. Ctr., 659 So. 2d 249 (Fla. 1995).

If these rules applied in this case, there would be no question to answer. The plaintiff could have chosen if and when to sue his medical providers, but Boozer (the initial tortfeasor) would not have been held responsible for damages caused by the medical providers (the subsequent tortfeasors).[5] However, these general rules do not apply because of a long-standing common law exception to the general common law rule that "each tortfeasor is only severally liable for the damage caused by its own tortious conduct," 86 C.J.S. Torts § 96 (June 2017 Update)—an

---

5. Although the Medical Provider defendants' negligence has not been established, "[b]ecause this case is before the Court on a motion to dismiss, the factual allegations stated in the [plaintiff's medical negligence] complaint[, as well as the facts alleged in the complaints filed by Boozer and her insurance company seeking equitable subrogation from the medial providers,] are accepted as true." S. Baptist Hosp. of Fla., Inc. v. Welker, 908 So. 2d 317, 320 (Fla. 2005).

exception that applies where, as here, the medical provider whose care is necessitated by the initial tortfeasor's negligence renders care negligently, further damaging the plaintiff.

## C. Exception for Initial Tortfeasor & Subsequent Negligence by Medical Provider

Even as jurisdictions rejected joint and several liability in most multiple-tortfeasor situations, they almost uniformly kept the rule that when a tortfeasor causes "another's bodily injury" and "additional bodily harm result[s] from . . . efforts of third persons in rendering aid which the other's injury reasonably requires, [the initial tortfeasor is held fully liable for the additional bodily harm,] irrespective of whether such acts are done in a proper or a negligent manner." Restatement (Second) of Torts § 457 (Mar. 2017 Update). The Restatement (Second) of Torts explains the basis for this rule as it relates to medical treatment as follows:

> It would be stretching the idea of probability too far to regard it as within the foresight of a negligent actor that his negligence might result in harm so severe as to require such services and therefore that he should foresee that such services might be improperly rendered. However, there is a risk involved in the human fallibility of physicians, surgeons, nurses, and hospital staffs which is inherent in the necessity of seeking their services. If the actor knows that his negligence may result in harm sufficiently severe to require such services, he should also recognize this as a risk involved in the other's forced submission to such services, and having put the other in a position to require them, the actor is responsible for any additional injury resulting from the other's exposure to this risk.

- 33 -

Id. at cmt. b.

As in almost all states, this was the long-standing rule in Florida. See J. Ray Arnold Lumber Corp. v. Richardson, 141 So. 133, 135 (Fla. 1932). And, the Legislature did not change this rule when it adopted section 768.81, Florida Statutes. See Assoc. for Retarded Citizens-Volusia, Inc. v. Fletcher, 741 So. 2d 520, 525 (Fla. 5th DCA 1999). As noted in several district court of appeal opinions,[6] this rule is contrary to Florida's general comparative negligence policy choice that favors not holding a person legally responsible for injuries that he or she did not legally cause.[7] However, I see no reason to question the Legislature's decision to stick with the near-universal rule in this context that favors fairness to

---

6. See, e.g., Caccavella v. Silverman, 814 So. 2d 1145, 1149 (Fla. 4th DCA 2002), review dismissed, 860 So. 2d 976 (2003); Letzter v. Cephas, 792 So. 2d 481, 488 (Fla. 4th DCA 2001).

7. Under basic tort "causation" principles, a person is not generally held liable for injury resulting from the independent negligent actions of a subsequent tortfeasor unless those actions are a reasonably foreseeable consequence of the initial tortfeasor's negligence. See Rawls v. Ziegler, 107 So. 2d 601, 605-06 (Fla. 1958) ("Where injury results from two separate and distinct acts of negligence by different persons operating and concurring simultaneously and concurrently, both are regarded as the proximate cause and recovery can be had against either or both. But where . . . an independent force or act intervenes to bring about a result that the defendant's negligence would not otherwise have produced, it is generally held that the defendant is liable only where the intervening force or act was reasonably foreseeable.") (citation omitted).

the plaintiff over the initial tortfeasor whose wrongful actions forced the plaintiff to seek medical care.

### D. The Initial Tortfeasor's Remedy

As a balance, however, the law also almost universally recognizes the need to provide a legal avenue for an initial tortfeasor, once liable for injuries attributable to subsequent medical negligence, to seek recourse from the medical provider(s) who legally caused the damages.  See generally, M. Flaherty, Right of Tortfeasor Initially Causing Injury to Recover Indemnity or Contribution from Medical Attendant Aggravating Injury or Causing New Injury in Course of Treatment, 72 A.L.R. 4th 231 (1989).  As indicated by the title of this article, most states rely upon an indemnity or contribution theory as the means through which the initial tortfeasor made liable for medical negligence can pursue a claim against the negligent medical provider(s).[8]  Id. at § 2[b].  Florida is virtually alone in its reliance upon equitable subrogation as the applicable legal theory.  Id.; see also Lloyds, 382 So. 2d at 704 (recognizing that "the doctrines of indemnity and contribution among subsequent tortfeasors are not cognizable under Florida law"

---

8. Some of these jurisdictions allow the initial tortfeasor to join the medical provider in the original suit, while others require an independent action brought after judgment is rendered against the initial tortfeasor.  Flaherty, supra, at § 2[b]. In some jurisdictions requiring a separate action, the second trial is permitted to proceed shortly after rendition of the initial verdict—using "the same jury that heard the initial action" or by the court (without a jury).  Id.

and opting to "align[] Florida with [two] jurisdictions relying upon subrogation as a remedy of affording an initial tortfeasor equitable apportionment of liability when a victim's injuries have been negligently aggravated by an attending doctor").

### III. ANSWERING THE REPHRASED QUESTION

With the proper framework in place, resolution of the question raised by the facts of this case easily flows from a reference back to the first principles of tort law and a simple step-by-step review of Florida's policy choices that have placed us in a position of needing to address the question at all.

First, Florida chose fairness to the injured party when it rejected contributory negligence in favor of comparative negligence. See Hoffman, 280 So. 2d at 438. This is particularly significant here because common sense suggests that the most significant damages flow from the brain injury and also suggests a fair probability that the brain injury could have been avoided had Hintz chosen to wear a helmet.[9]

Second, Florida chose fairness to the injured party by choosing the fair recovery principle over the fair apportionment principle in this narrow category of multiple-tortfeasor cases and thereby allowed the plaintiff to recover a judgment

---

9. Because Florida generally apportions damages based upon fault rather than cause, the jury was not asked to link the initial head injury to the respective breaches of duty by the plaintiff and the initial tortfeasor. See generally § 768.81(2)-(3), Fla. Stat. (2015).

from the initial tortfeasor for damages attributable to the subsequent tortfeasor. See Stuart, 351 So. 2d at 706.

Third, Florida chose fairness to the plaintiff by choosing the plaintiff's choice principle over the joinder principle and barring the initial tortfeasor from joining the medical provider in the initial suit. See id.

Fourth, Florida chose fairness to the plaintiff by choosing the plaintiff's choice principle over the fair apportionment principle and barring the initial tortfeasor from bringing an action independent of the original plaintiff and against the subsequent tortfeasor, even after entry of the judgment against it for damages attributable to the subsequent tortfeasor, without first fully satisfying the judgment (which the initial tortfeasor in this case clearly cannot do). See Lloyds, 382 So. 2d at 703-704 (holding initial tortfeasor could state a claim for equitable subrogation against the allegedly negligent medical provider on facts where the initial tortfeasor had previously "settl[ed] with the victim for all injuries flowing from the accident and her treatment thereof").

But the facts of the case before us necessitate another policy choice. At this juncture, if the goal really is to be as fair as possible to all parties and as efficient as possible for society, it is time to consider fairness to the initial tortfeasor and society's interest in efficiency. Barring the initial tortfeasor's action now that the injured party has filed suit against his medical providers does nothing to satisfy any

first principle.  Allowing the action honors both the joinder principle and the fair apportionment principle.  The answer is clear.  Now that the injured party has sued his medical providers, the initial tortfeasor who has been legally "placed 'in the shoes' of the plaintiff" must be allowed to join the plaintiff's action to protect its interests.[10]  Id. at 704 (quoting 30 Fla. Jur. Subrogation § 11).

The majority's contrary result seems to be grounded in two concerns.  First, the majority seems to imply that something in the nature of the equitable subrogation doctrine itself prevents this fair result.  It does not.  Despite the fact that subrogation is generally described as an equitable remedy for those who "pay" the debts of others, "[m]ost courts . . . appear to be permitting . . . contingent subrogation claims as a matter of right, in accordance with [federal and state procedural joinder rules]."  Gregory R. Veal, Subrogation: The Duties and Obligations of the Insured and Rights of the Insurer Revisited, 28 Torts & Ins. L.J. 69, 84 (1992).  The same is true in Florida, at least in other contexts.  See Attorneys' Title Ins. Fund, Inc. v. Punta Gorda Isles, Inc., 547 So. 2d 1250, 1251

---

10. Justice Pariente correctly notes that Boozer and her insurer initially requested to substitute for the plaintiff.  See concurring op. at 20 (Pariente, J.).  However, the trial court denied that request, and Boozer does not challenge that decision.  Boozer then filed an amended complaint seeking to join with plaintiff in claiming what is sought by the plaintiff's complaint (on the theory that since plaintiff made her legally liable for the same damages plaintiff now seeks from the medical providers, equity should allow her to join the action and protect her rights vis-à-vis the subsequent tortfeasors whose negligence caused the damages for which she is now liable).

- 38 -

(Fla. 2d DCA 1989) (holding that Florida law permits the filing of contingent subrogation claims because it is more convenient than requiring a second suit and because Florida Rule of Civil Procedure 1.180 (Florida's procedural joinder rule) permits it); see also Essex Builders Grp., Inc. v. Amerisure Ins. Co., 429 F. Supp. 2d 1274, 1289 (M.D. Fla. 2005) ("Florida decisions hold that contingent claims of equitable subrogation and contribution can be asserted prior to making payment."). More importantly, the very nature of this equitable doctrine is flexibility to promote fairness, as the Fifth District correctly recognized below. See Allstate Ins. Co. v. Theodotou, 171 So. 3d 163, 167-68 (Fla. 5th DCA 2015) (relying on equity's favor of "justice and fairness over formalistic legal rules" and Lloyds' policy goal of "ensur[ing] that liability is correctly apportioned and [the initial tortfeasor] is not held liable for more than her fair share" to authorize the contingent equitable subrogation claim against the Medical Provider defendants).

As explained by this Court more than eighty years ago,

> [t]he doctrine of subrogation . . . has long been an established branch of equity jurisprudence. It does not owe its origin to statute or custom, but it is a creature of courts of equity, having for its basis the doing of complete and perfect justice between the parties without regard to form. It is a doctrine, therefore, which will be applied or not according to the dictates of equity and good conscience, and considerations of public policy, and will be allowed in all cases where the equities of the case demand it.

<u>Dantzler Lumber & Exp. Co. v. Columbia Cas. Co.</u>, 156 So. 116, 119 (Fla. 1934) (quoting 25 R.C.L. 1313) (emphasis added).  We followed this declaration of the limits and contours of the doctrine with another declaration: "Our court is committed to a liberal application of the rule of equitable subrogation."  <u>Id.</u> at 120.  The majority's narrow, formalistic holding stands in odd juxtaposition with the nature of the remedy that it purports to apply—a "remedy" that on the actual facts of this case provides no remedy at all.  "[E]quity and good conscience" demand a different result—a result that is consistent with the first principles of Florida's tort law and the policy choices they have informed, including this Court's commitment to liberal application of the rule of equitable subrogation.  <u>Lloyds</u>, 382 So. 2d at 704.

The majority's second concern seems to be fairness to the plaintiff, although this concern does not seem to be grounded in any recognized general policy principle.  Rather, the majority observes that permitting joinder of the initial tortfeasor would "overly complicate the litigation and unfairly prejudice Hintz."  Majority op. at 18.  I have three responses to this unexplained and unsupported claim.

First, joinder is universally favored in every jurisdiction in this nation, in most instances despite the fact that adding parties will always in some vague sense

complicate the litigation and thereby "prejudice" the party who would rather exclude the to-be-joined party.

Second, I do not see the complication here where Boozer "stands in the shoes" of Hintz and has the same interest in having the Medical Provider defendants held fully responsible for the damages caused by their negligence. If the matter goes to trial, it should be easy to devise an instruction that explains Boozer's presence in a way that prejudices no one. The only real complication for Hintz is that he will not be able to settle with the Medical Provider defendants without negotiating a release of some kind with Boozer (and her insurance company). But, is that unfair? It was Hintz himself who made Boozer a co-owner of his claim against the Medical Provider defendants by first securing a judgment against Boozer for damages attributable to them. If Hintz decides that he is willing to accept less than the full value of the damages claim against the Medical Provider defendants in full settlement of the claim, it seems intolerably unfair to suggest that Boozer should be left holding the bag and denied a seat at the table to assure that her liability for those same damages is fairly reduced as well.[11] In short, it is only Boozer who stands to suffer any real (legal) prejudice from the majority's rule.

---

11. It is for this reason that I disagree with Justice Pariente's argument that Boozer's interests will be fully protected as a non-party simply because "the injured plaintiff has a real incentive to obtain the maximum amount against the Medical Provider defendants," as Justice Pariente argues. See concurring op. at 23 (Pariente, J.). The vast majority of cases settle for less than the "maximum

Third, the fairness or policy decision that we make <u>at this juncture</u> should not be made in isolation, but with reference to the policy decisions that proceeded this one and landed us here.  As with all policy decisions, it should also be made by reference to the basic principles underlying this area of the law.  As explained above, to this point we have chosen first principles that favor the plaintiff with every decision.  Of course, each prior choice involved a balancing of competing principles, and I do not take issue with any of the prior choices.  I do, however, take issue with the majority's decision, as expounded by Justice Pariente's concurrence, that Boozer's inability to satisfy the judgment is the death knell of the contingent equitable subrogation claim.  For all the "equitable considerations" the majority purports to weigh, <u>see</u> concurring op. at 23 (Pariente, J.), this inequitable holding underscores the majority's failure to account for first principles that demand a different outcome in this case.  With the fair apportionment and joinder

---

amount" or full value of a claim.  That is the nature of compromise and settlement. The allegation in this case is that medical negligence occurred and is the legal cause of plaintiff's permanent brain injury—which would account for most of the $10 million or so in unpaid damages for which Boozer is still responsible.  If we (or the plaintiff) had chosen fair apportionment and joinder in the first place, a jury would have already made the determination as to who—between Boozer and the medical providers—is primarily responsible for most of plaintiff's damages. Because we did not—and made Boozer liable for all damages—Boozer should be allowed to fully participate in the proceeding where that determination will now be made.  If she is not, plaintiff and the Medical Provider defendants could compromise and settle for less than full value, as most parties do, dismissing the suit and leaving Boozer still liable for millions of dollars in damages attributable to the negligence of the Medical Provider defendants.

principles on Boozer's side of the scale and no first principle on the other, there is only one way the scale can now tip, if it is calibrated evenly: allow the contingent equitable subrogation claim.

## IV.  CONCLUSION

I would answer the rephrased question in the affirmative and approve the result reached by the Fifth District Court of Appeal.  Therefore, I respectfully dissent.

CANADY, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Certified Great Public Importance

     Fifth District - Case Nos. 5D14-1291, 5D14-1352, and 5D14-1436

     (Brevard County)

Sylvia H. Walbolt and Steven M. Blickensderfer of Carlton Fields Jorden Burt, P.A., Tampa, Florida; and Henry W. Jewett, II, and Karissa L. Owens of Rissman, Barrett, Hurt, Donahue & McLain, P.A., Orlando, Florida,

     for Petitioner Holmes Regional Medical Center

Angela E. Rodante and Dale M. Swope of Swope Rodante, P.A., Tampa, Florida; Hendrik Uiterwyk and John C. Hamilton of Abrahamson & Uiterwyk, Tampa, Florida; and Barbara Green of Barbara Green, P.A., Coral Gables, Florida,

     for Petitioner Douglas Stalley, as Guardian of the Property of Benjamin Edward Hintz

Thomas E. Dukes, III, and Wilbert R. Vancol of McEwan, Martinez, Dukes & Hall, P.A., Orlando, Florida,

     for Petitioners David Packey, M.D., and Neurology Clinic, P.A.

Stephen B. Sambol of Mateer & Harbert, P.A., Orlando, Florida,

for Petitioners Basil Theodotou, M.D., and Basil Theodotou, M.D., P.A.

Daniel A. Martinez, Weslee L. Ferron, Inguna Varslavane-Callahan, and Jennifer C. Worden of Martinez Denbo, L.L.C., Saint Petersburg, Florida,

for Respondents Allstate Insurance Company and Allstate Indemnity Company

Jane Anderson and Kansas R. Gooden of Boyd & Jenerette, PA, Jacksonville, Florida,

for Respondent Emily Boozer

Andrew S. Bolin of Beytin, McLaughlin, McLaughlin, O'Hara, Bocchino & Bolin, Tampa, Florida,

for Amicus Curiae Florida Hospital Association

Roy D. Wasson of Wasson & Associates, Chartered, Miami, Florida,

for Amicus Curiae Florida Justice Association

Michael C. Clarke and Betsy E. Gallagher of Kubicki Draper, P.A., Tampa, Florida,

for Amici Curiae American Insurance Association and Florida Insurance Council